CORNELIUS STEWART AND JOSEPH C. STEWART, PLAINTIFFS IN ERROR, v. THE LEHIGH VALLEY RAILROAD COMPANY, DEFENDANTS IN ERROR.

1. The supplement to the charter of The Morris Canal and Banking Company, approved March 14th, 1871, (*Pamph. L.*, 1871, *p.* 444,) which authorized the company "to lease to any person or persons, or corporation," empowered it to make a lease to a foreign corporation which had theretofore been recognized by our legislature, and which had a pre-existing capacity to accept the lease.
2. The words "equal to," in a contract, *held* to mean "not less than."
3. A covenant by The Morris Canal and Banking Company not to allow to others a drawback from established rates on the transportation of merchandise over its canal, which it agreed to allow to the covenantee, is against public policy and void.
4. Such a covenant does not, however, invalidate the entire contract in which it exists, and from the remainder of which it is severable.
5. The agreement to allow the drawback to the covenantee is valid and enforceable, and others are entitled to equally reasonable terms.
6. An express contract between the director of a corporation and his company is not void, but is voidable at the option of the *cestui que*

*trust* exercised within a reasonable time.    No consideration of its apparent or intrinsic fairness will induce a court, either of law or equity, to enforce it against the resisting *cestui que trust.*

7.  Such a contract is, however, valid and enforceable as to others.

In error to Supreme Court.

For the plaintiffs, *Vanatta,* Attorney-General, and *B. Williamson.*

For the defendants, *Thos. N. McCarter.*

The opinion of the court was delivered by

DIXON, J.    The Lehigh Valley Railroad Company sued Cornelius Stewart and Joseph C. Stewart, in *assumpsit,* for tolls for the passage of boats with merchandise over the Morris canal.    The defendants pleaded *non assumpserunt;* and as a further plea, alleged that they had paid all the moneys demanded by the plaintiffs, except $9634.82;  and as to that sum, they said that on the 29th day of January, A. D. 1868, The Morris Canal and Banking Company made with the defendants an agreement, in writing, under seal, which agreement is set out in full in the pleadings, and is as follows:

This agreement made this twenty-ninth day of January, in the year of our Lord one thousand eight hundred and sixty-eight, between The Morris Canal and Banking Company, a body corporate of the State of New Jersey, party of the first part, and Cornelius Stewart, of the township of Lebanon, in the county of Hunterdon, and Joseph C. Stewart, of the township of Washington, in the county of Warren, and state aforesaid, partners in business, trading in the name, style and firm of C. Stewart & Son, parties of the second part, witnesseth:

That whereas the parties of the second part propose to organize and carry on a freight line for the transportation of goods, wares and merchandise upon and over the Morris canal.

Now the said party of the first part, for and in consideration of the sum of one dollar, lawful money of the United States, to them in hand paid by them, the said parties of the second part, at and before the delivery of these presents, the receipt whereof is hereby acknowledged, and for the purpose of enabling the said parties of the second part to organize and carry on the said freight line, do hereby grant and lease unto the said parties of the second part the following named boats (the value of each being herein expressed and set forth,) for the term of five years from the date hereof, to wit:

| | | | | |
|---|---|---|---|---|
| Morris Canal | Register, | No. | 627 | $125 |
| " | " | " | " | 631 | 125 |
| " | " | " | " | 634 | 325 |
| " | " | " | " | 635 | 400 |
| " | " | " | " | 636 | 450 |
| " | " | " | " | 637 | 550 |
| " | " | " | " | 638 | 475 |
| " | " | " | " | 639 | 400 |
| " | " | " | " | 640 | 415 |
| " | " | " | " | 641 | 600 |
| " | " | " | " | 642 | 600 |
| " | " | " | " | 643 | 650 |
| " | " | " | " | 645 | 950 |
| " | " | " | " | 693 | 150 |
| " | " | " | " | 978 | 100 |
| " | " | " | " | 981 | 100 |
| " | " | " | " | 1071 | 150 |
| " | " | " | " | 1072 | 225 |
| " | " | " | " | 1073 | 175 |
| " | " | " | " | 1074 | 150 |
| " | " | " | " | 1686 | 725 |
| " | " | " | " | 1687 | 725 |
| " | " | " | " | 1688 | 725 |
| " | " | " | " | 1689 | 750 |
| " | " | " | " | 1692 | 750 |
| " | " | " | " | 1693 | 725 |
| " | " | " | " | 1694 | 675 |

| | | | | | |
|---|---|---|---|---|---|
| Morris Canal | Register, | No. | 1695 | ..........  .............  .......... | $750 |
| " | " | " | " | 1697 | ......... .............  ......... | 750 |
| " | " | " | " | 1698 | ......... ................  ......... | 725 |
| " | " | " | " | 1699 | .........  .........  ......... | 775 |
| " | " | " | " | 1700 | ..........  . .......  ......... | 775 |

The total valuation of said boats being ($15,965) fifteen thousand nine hundred and sixty-five dollars, and the said parties of the second part, for and in consideration of the sum of one dollar, lawful money of the United States, to them in hand paid by the said party of the first part, at and before the delivery of these presents, the receipt whereof is hereby acknowledged, and of the privileges to them granted, herein contained, for themselves, their heirs, executors and administrators, do covenant and agree to and with the said party of the first part to pay them, the said party of the first part, the aforesaid sum of fifteen thousand nine hundred and sixty-five dollars for the said boats as above described, in ten equal semi-annual instalments, the first instalment to be due and payable on the fifteenth day of July, one thousand eight hundred and sixty-eight, with interest at the rate of seven per cent. upon the said instalment, and the amount of instalment unpaid, and the said party of the first part do hereby covenant and agree to give the said parties of the second part, lawful bills of sale for the before mentioned boats, upon the payment of the tenth semi-annual instalment above mentioned.

And the said parties of the second part do hereby agree to furnish the said boats with the necessary rigging and with competent and capable captains and crews, and to employ the said boats in a freight line upon and over the Morris canal exclusively, unless upon the written consent of the party of the first part, and to keep each of the said boats in good repairs during the said term of five years, or as long as the same are fit to run in the said line; and the said parties of the second part do further agree to keep the number of boats in the said freight line during the said term of five years, equal to the number of boats herein granted and leased to

Stewart v. Lehigh Valley R. R. Co.

them, the said parties of the second part, unless the consent of the said party of the first part thereto, in writing, be first had and obtained.

And the said parties of the second part do hereby further agree to pay to the said party of the first part full rates of toll according to the printed rates of toll for the time being, as established and published by the said party of the first part, upon all articles which may be transported upon and over the Morris canal in the said boats employed in the said freight line.

And the said parties of the first part do hereby agree to allow the said parties of the second part a drawback of one-half of such tolls upon all such merchandise, lumber, plaster and bituminous coal, as shall be transported by the said parties of the second part in the boats of the said freight line westward upon the said canal; and also upon all articles that shall be transported by the said parties of the second part in the boats of the said freight line eastward upon the said canal, except charcoal, mineral coal, ice, iron ore, lime in bulk, limestone, post and rails, railroad ties, zinc ore and wood.

And the said party of the first part do hereby agree to and with the said parties of the second part, that the boats of the said freight line shall have the same privileges of loading other freight at Port Delaware and Port Washington, as are now afforded to and possessed by the New Jersey and Pennsylvania freight line.

And the said party of the first part do further agree to and with the parties of the second part, that no drawback from the established rates of tolls shall be allowed to any other party or parties competing with the said freight line of the parties of the second part, for the same business, upon and over the Morris canal, during the said term of five years, unless the said parties of the second part shall, by negligence, carelessness, or otherwise fail to secure and maintain the business, which it is contemplated and intended shall be transacted and carried on by the said freight line of the said parties of the second part.

And the said party of the first part do hereby agree that the party of the second part may terminate this lease at the expiration of the first year thereof, upon giving to them, the said party of the first part, three months notice, in writing, of their intentions so to do; and whenever this lease is terminated, the party of the first part will take from the party of the second part, the boats employed in the said freight line, at their proper value as coal boats.

And the said party of the first part do hereby agree, that if the said party of the second part do well and faithfully fulfil all the covenants and stipulations herein contained on their part to be done and performed, the said party of the first part will, from time to time, give lawful bills of sale for such of the before mentioned boats as may become unfit for use in the said freight line.

In witness whereof, &c.

And the defendants' said plea further averred, that after the making of that agreement, the defendants did organize and put in operation the freight line mentioned therein, and included therein the boats named in said agreement and other boats of the defendants, and thereafter carried on the said freight line for the transportation of goods, wares and merchandise upon the Morris canal according to the terms, true intent and meaning of said agreement, and at all times performed, fulfilled and kept all the covenants in said agreement on their part; that afterwards, on the 1st day of April, A. D. 1871, The Morris Canal and Banking Company leased and demised, for a term not yet ended, to the plaintiff, the Morris canal, with all its boats, property, works, appurtenances and franchises, powers and privileges, and also assigned to the plaintiff all the contracts, agreements and rights in action of said canal company, including the said agreement so made with the defendants, and the plaintiff accepted the said assignment and adopted the said agreement as their own, and had received the benefits thereof, and promised and agreed to fulfil and perform the same for and on the part of

the said canal company, so far as the same was to be performed, observed and kept by said canal company. That by virtue of said agreement, the defendants, from the 31st day of March, A. D. 1871, until the 1st day of January, A. D. 1872, in the boats of said freight line, including as well the boats named in said agreement as other boats of said defendants which were rented of the said plaintiff, and added to and made a part of the said freight line, did transport over said canal large quantities of merchandise, lumber, plaster and bituminous coal, westward ; and also large quantities of merchandise, goods, chattels and personal property, eastward, (not including charcoal, mineral coal, ore, iron ore, lime in bulk, limestone, posts and rails, railroad ties, zinc ore, nor wood,) in respect of and upon which the sum of $19,269.64 of tolls accrued to the plaintiff as lessee and assignee of the said canal company, and upon which tolls, by virtue of said agreement, the defendants became entitled to a drawback of one-half, viz.: $9634.82, which sum was then still due to the defendants from the plaintiff; and defendants in their said plea offered to set off and allow to the plaintiff the said sum in full payment and satisfaction of the like sum remaining as before mentioned unpaid of the tolls.

To this second plea the plaintiff replied that the sum of $19,269.64, alleged in the plea to have accrued for tolls, accrued wholly to the plaintiff in respect of merchandise, goods and chattels transported by the defendants over the said canal, in other boats than the thirty-two boats particularly mentioned in the said agreement, and not to any extent for merchandise transported in any of said thirty-two boats.

To this replication the defendants demurred, and, the demurrer being argued, the Supreme Court held the second plea bad, upon the ground that the drawback allowed in said agreement was to apply only to the freight carried in thirty-two boats, and no more, and therefore rendered judgment for the plaintiff on the demurrer.

The giving of this judgment is assigned as the first error in the cause.

The cause thereafter went down to Hudson Circuit for trial upon the issues of fact remaining, and, on such trial, the plaintiff, in order to show its right to the tolls, offered in evidence a lease to it from The Morris Canal and Banking Company, dated May 4th, 1871, leasing the Morris canal, with all the property and franchise of said canal company, to the plaintiff, for a term not yet ended. To this lease the defendants objected, on the ground that there was no power in the canal company to transfer its rights and franchises to the plaintiff, a foreign corporation, and the justice at the trial, having admitted it, sealed an exception of the defendants thereto.

At the trial, also, the justice construed the contract of January 29th, 1868, in the same manner as the Supreme Court had done, and, upon this construction, various exceptions taken by the defendants were sealed, and upon these exceptions error has been assigned. From these alleged errors spring all the questions which it is necessary to decide in this cause.

And, first, as to the validity of the lease adduced by the plaintiff in support of its claim.

The Morris Canal and Banking Company had, under its charter, constructed a canal from Phillipsburg, on the Delaware river, to Jersey City, on the Hudson, and possessed the franchise of charging tolls for merchandise transported over it. By an act approved March 14th, 1871, (*Pamph. L.*, 1871, *p.* 444,) the legislature of this state enacted that it should be lawful for the said company to lease its canal, or any part thereof, with all or any of its boats, property, works, appurtenances and franchises, to any person or persons or corporation, either perpetually or for such shorter time, and upon such rents and agreements as might be agreed upon between the contracting parties, and that it should be lawful for the lessee or lessees in said lease to use and enjoy the franchises and property so demised for the term in said lease mentioned.

The objection urged against the lease is, that it is made to

Stewart v. Lehigh Valley R. R. Co.

a foreign corporation, while, it is insisted, this statute author-
izes a lease to a domestic corporation only.

It is not open to dispute that such a lease as this can be
valid only if sanctioned by the legislature. Nor is such sanc-
tion to be implied; it must rest upon a clear expression of
the legislative intention. It must be gathered, in the first
place, from the words which the legislature has used upon
the subject, and if those words, construed according to their
usual signification, declare the purpose to authorize a lease to
a foreign corporation, or to a class of corporations which in-
cludes the plaintiff, we must give effect to such purpose. The
court has no right to add to the words of the legislature, or
to substitute other words for them, in order to widen the
power conferred; nor has it more right to strike out words
or detract from their fair and ordinary meaning, for the pur-
pose of restricting the grant. The duty of the court is one of
interpretation merely. The words used in this act of 1871
are, " to lease  \*  \*  \*   to any person or persons or corpo-
ration." Does the plaintiff come within the class which, in
the view of the legislature, embraced " any corporation?"

It does not seem to me consistent with the natural import
of this expression to hold that it includes only corporations
created by the laws of this state. Corporations formed under
laws passed beyond the limits of our own commonwealth are
too frequent as suitors in our courts, and as subjects of our
legislation; they have too well recognized and substantial an
existence in the social system of all the states of our Union
for us to say that when the legislature speaks of *any* corpora-
tion, it means no other than those of its own creation. There
is, upon our statute books, scarcely even a general law relating
to corporations, in which the legislature has not felt con-
strained, when desiring to confine its enactments to corpora-
tions of our own state, to employ some restrictive phrase
which should exclude corporations of other states. In the
case of *Black et al.* v. *The Delaware and Raritan Canal Com-
pany et al.*, 9 *C. E. Green* 455, where this court held that the
power to take by lease was limited to corporations of this

state, the legislature had so declared in express terms, " any company in this state," was the phrase by which the class of lessees was there designated. Nor do I think it necessary for the purposes of this case, to determine whether the words " any corporation," in this act, include every corporation, foreign or domestic. They probably do not include every foreign corporation or every domestic corporation; but I think it quite safe to say that they do include every corporation which had been recognized as such by our legislature, and which had a pre-existing capacity to accept the lease. Within a class thus limited, the plaintiff stands. By an act approved March 11th, 1850, (*Pamph. L.* 313,) the legislature granted permission to this company (by its old name) to build a railroad bridge across the Delaware river at Easton. By an act approved March 9th, 1855, (*Pamph. L.* 215,) The Morris Canal and Banking Company were empowered to construct a railway connecting their canal with the road of The Lehigh Valley Railroad Company, and, under this act, such a connection was long since made, as the bills of exceptions now before us show. By the legislation of the State of Pennsylvania, (*Laws,* 1870, *p.* 31; *Laws,* 1871, *p.* 248,) whose laws created the plaintiff, full power was conferred upon the plaintiff to become lessee, or enter into any other contract with any corporation, relating to any railroad or canal or other navigation works, situated either in Pennsylvania or any other state. Under these circumstances, it would, I think, be a construction narrower than the fair, ordinary import of the words used, to hold that the legislature did not intend to authorize a lease to the plaintiff. No reason, therefore, appears upon this record for denying to the plaintiff the rights which this lease purports to confer.

The general right of the plaintiff to sue for tolls upon the canal being thus established, the next question is as to the construction of the contract of January 29th, 1868—whether, under that contract, the defendants' claim to a drawback of fifty per cent. is limited to the merchandise transported in thirty-two boats leased by that agreement, and such other

boats as might be substituted for them, to keep up a freight line of just thirty-two boats, or extends to all the boats employed by the defendants in the freight line, without restriction in number. The contract recites that the defendants proposed to organize and carry on a freight line for the transportation of merchandise upon the Morris canal, and that, for the purpose of enabling them so to do, the canal company leased to them the boats designated for the term of five years. By its provisions the defendants were to be allowed a drawback of one-half of the established rates of tolls upon all merchandise, lumber, plaster, and bituminous coal transported in the boats of their freight line westward, and upon all articles transported in the boats of the freight line eastward, except certain designated articles ; and no drawback from the established rates of toll was to be allowed to any other party competing with the said freight line for the same business, during said term of five years, unless the defendants should, by negligence, carelessness, or otherwise, fail to secure and maintain the business which it was contemplated and intended should be transacted and carried on by said freight line.

Now, it seems to me, that the object of the parties in making this contract is thus clearly shown, and it was, that the defendants should organize, and for five years maintain a freight line in which they should monopolize the carrying trade in certain articles over the Morris canal, and to aid them in so doing, the canal company transfers to them thirty-two boats, and agrees to allow them a drawback of fifty per cent. upon the published tolls, which was to be allowed to no competitor, so long as the defendants transacted the business intended. And if this object be borne in mind in construing, as it was doubtless borne in mind by the parties in framing the contract, much light will be thrown upon the way to correctly determine whether they intended to limit the number of boats in the freight line to thirty-two. If they did intend so to limit the line, then, so long as the defendants kept that number of boats actively engaged, they could not be said to have failed, by negligence, carelessness, or otherwise, in secur-

ing and maintaining the business they were to do, and, so long, the canal company contracted to allow no drawback to any competitor. The result would be, that any surplus of freight above the carrying capacity of thirty-two boats would lie accumulating on the wharves, or seek other routes. It was evidently the belief of the parties that, at the time of making the contract, thirty-two boats were necessary for the transaction of the intended business, and it is unlikely that they did not expect, or at least hope for an increase during the five years through which the contract might remain in force. And yet, if the drawback was to be allowed to thirty-two boats only, such increase would be not merely hindered, but prevented, for the defendants would never put on the thirty-third boat, in order to carry the freight at double rates, nor could any one else be allowed, according to this contract, to carry it at less. Is it reasonable to believe, that the managers of the canal company intended any such result? Their canal was constructed, and their revenue, its tolls. The greater the quantity of merchandise transported, the larger the amount of those tolls. If they could afford to pass the freight of thirty-two boats at half rates, still more could they afford to pass the freight of fifty boats at the same rates; for the interest on the capital invested was a constant quantity, whether one boat or a hundred used their locks; only the running expenses were variable, and even these would increase in a less ratio than the tonnage. Upon what reason, then, can it be presumed that they should give inducements for freight to fill thirty-two boats, and then should contract to repel all other freight that offered? Such a construction is, I think, inconsistent with any intention which the parties may fairly be supposed to have had. In my judgment, the business contemplated by the contract, was the business of transporting as much merchandise of all kinds as could be induced to go by this route, westward, and as much merchandise, outside of the excepted articles specified, as could be induced to go by this route eastward. The contract bound the defendants, at all events, to keep thirty-two boats in good repair employed in the freight

line, and so they were constrained to find freight for that number. If more freight presented itself than these thirty-two boats could accommodate, then they were to furnish more boats, or else they were failing to secure and maintain the business contemplated, and then the canal company was to have the right to offer to competitors the same inducements as those the defendants had. Such a scheme secured to the canal company the freight of thirty-two boats at least, and repelled no business, but left them at liberty to attract all they could, and take all that offered.

Let us look at the grounds upon which an opposite construction is based. In the first place, the defendants agree to keep the number of boats in the freight line *equal to* the number of boats leased, of which there are just thirty-two; and on this it is argued, that *equal to* means neither more nor less. If in the statement of a mathematical problem, we found these words, we would not dare to question this interpretation, for in that exact science, equality conveys the idea of identity in size and form at least. But one of the primary rules of legal construction, founded upon common sense, and fortified by impregnable authorities, is that words in a contract are to be construed not according to any technical or scientific standard, but their ordinary import, if they have one. And in common use, words which are absolutely exact in mathematics, are inexact and vague. A line, mathematically, has no breadth. The line of a railroad is a highway a hundred feet wide. A point has neither length, nor breadth, nor thickness. The point of an argument has often much of all. With similar indefiniteness may we employ the phrase " equal to." It always, I think, excludes the idea of inferiority, and therefore when we assert that two things are equal to each other, we give it more of mathematical accuracy, because we deny the inferiority of either to the other; but when we say that one person or thing is equal to another, we do not necessarily nor ordinarily deny its superiority to that other. We, in such assertions, recognize the notion that the greater includes the less, and so do not deny that the greater equals the less, be-

cause it contains that which does, in the strictest sense, equal the less. Indeed, this phrase, "equal to," when coupled with an adverbial modification, contains a strong implication of superiority. "Washington was at least *equal* to Arnold in patriotism," is a statement which, though true, by no means converts the traitor into a lover of his country. Nor is it necessary to go far to find an instance in which a form of this word "equal" is used in the sense that, I think, it has in this contract. In the sixth standing rule of the Supreme Court, after stating upon what terms an attorney from *another state* will be admitted to examination for license as an attorney in this state, is a proviso that no such person shall be admitted, unless an attorney from this state could be admitted in such other state *on the same or equally liberal terms.* Will it be contended, that if the terms of admission in such other state were not the *same* as ours, but were *more* liberal, therefore the Supreme Court should, under this rule, exclude the applicant? Are their terms not *equal* to ours in liberality, because they *exceed* ours in that respect? But examples need not be cited for so common a use of the word, nor would its meaning have seemed to me to justify so much discussion, had it not been strenuously urged upon the court as of controlling force in the controversy. "Equal to," in this contract, means "not less than."

Again it is insisted that, because the agreement is that the defendants shall pay full rates of toll upon all articles transported in the *said* boats of the said freight line, therefore only thirty-two boats are stipulated for. I do not see the connection between the reason and the conclusion in this proposition. The contract, prior to this clause, has referred to two classes of boats—the thirty-two leased boats and the boats of the freight line. It is not claimed that this expression, "*said boats,*" refers merely to the thirty-two leased boats, for all concede that the freight line might, at some time, contain other boats than these, and it must refer to the boats of the freight line, but how it aids in fixing the number of these boats I fail to percieve. In the drawback clause, and in

every other clause of the contract except this, the boats of the freight line are spoken of without using this relative word "said." Its use here and its absence elsewhere, are, to my mind, alike unimportant. The intent of the parties is not to be ascertained by such nice criticism.

A more rational ground for repelling the construction claimed by the defendants, and a reason insisted upon by the plaintiff as a most conclusive answer to that claim, is the paragraph which provides that the defendants may terminate the contract at the end of the first year, by three months' notice, and that, when it is terminated, the canal company will take from the defendants the boats employed in the said freight line, at their proper value as coal boats. The question is propounded, could the canal company have intended so to buy as many boats as the defendants might choose to add to the line? If the proper legal limits to the company's duty under this covenant be remembered, an affirmative answer to this query calls for no extraordinary stretch of credulity. The boats must have been *bona fide* employed in the freight line. Their multitude could not be very great; the limits of business would control it. They were to be employed in a line, the business of which was general freighting, for which a class of boats more expensive than coal boats must usually be furnished. The company having upon its canal a large business in the transportation of coal, in which it used a large number of boats, was to pay for these defendants' boats only their value as coal boats. So that, at most, the company was only contracting to give its money for an equivalent in articles for which it had constant use. The defendants, on the other hand, if they availed themselves of this provision, were to part with their property at a price less than its general value—at its value for a restricted use. The company, in this covenant, evidently relied upon the defendants being actuated by their self-interest in maintaining their freight line, and trusted that they would not uselessly buy boats at a higher price, in order to thrust them upon the company at a lower valuation. It is not hard to suppose that its

managers would think it safe in so contracting. The defendants, at most, could not go beyond the *bona fide* requirements of their freight business, and their interest would keep them as far inside of even these bounds as practicable. I see no inconsistency between this paragraph and the construction contended for by the defendants. The result of this construction of the contract is, that the judgment of the Supreme Court upon the demurrer, and the rulings of the justice at the circuit in pursuance of it, are erroneous.

It is, however, insisted on the part of the plaintiff that the whole contract is void, because it provides that no drawback from the established rates of toll shall be allowed to any party competing with the freight line of the defendants, unless, &c. The invalidity of that covenant in the contract cannot be doubted. The Morris canal was a public highway, through which all the people of the state had a right to transport their goods, upon paying the lawful tolls. The right to collect these tolls was a franchise of the state conferred upon the canal company, to be exercised with impartiality towards the public; and because this was a covenant that, in the exercise of this franchise, the company would discriminate in favor of the defendants and against others, it was in violation of public duty, and was void. *Messenger et al.* v. *Penna. R. R. Co.,* 8 *Vroom* 531.

But it by no means follows that because this agreement not to allow drawback to others is void, therefore the agreement to allow it to the defendants also falls. The policy which holds invalid such monopoly clauses, exists for the benefit not of the corporation, but of the public, and its true legal aspect is presented in saying, not that the company must charge the defendants as high rates of toll as it charges others generally, but that it must charge others generally as reasonable rates of toll as it charges the defendants. The interests of the corporation in this respect may safely enough be confided to its own keeping; it is the interest of the public which this principle of policy is intended to guard. The contract held invalid in the Messenger case, above cited, was indeed one enuring to

the benefit of the individual and against the corporation, but its terms were such that it could not possibly be effectuated without giving the plaintiff a preference over the public; it was, in effect, that whatever rate should be charged against any one else, twenty per centum less should be charged to the plaintiff. Plainly, such a contract was not consistent with the company's duty of impartiality. As soon as the general rates were reduced to the standard of the plaintiff's, he was entitled to have his rates reduced twenty per centum lower. In the case before us, however, the drawback is not to be governed by the rates charged the public, but by the printed rates of tolls for the time being, and the general right of the public in no way conflicts with such an allowance, that right being to have the general actual charges fixed, not at the same rate, but at as reasonable a rate, all things being considered, as that charged to the defendants. Obviously, therefore, the drawback clause in this contract is in no way involved with, or dependent upon, the monopoly clause; and, in accordance with the well-settled principle so clearly applied by the Supreme Court of this state in the case of *The Erie Railway Co.* ads. *The Union Locomotive Express Co.*, 6 *Vroom* 240, the illegality of the latter does not affect the validity of the former covenant.

The plaintiff raises another and a most important question touching the validity of this contract, by a second replication to the second plea before mentioned, upon which no issue was joined, because of the judgment of the Supreme Court holding that plea bad. The main fact averred in the replication also appeared in evidence at the trial, and testimony as to some of the outlying circumstances was offered by the defendants, excluded and exception taken. On the argument before this court, the counsel for the plaintiff urged this main fact as necessarily invalidating the contract relied on by the defendants. This fact is, that at the time of the negotiations for, and the execution of, the contract in question, one of the defendants was a director of The Morris Canal and Banking Company—a trustee for it, to manage its affairs—and it is

insisted that his relation to the company was, therefore, such that he was prohibited from entering into this contract with it, and that the contract is, *ipso facto*, void.

The position thus assumed by the plaintiff rests upon the broad principle that it was the duty of the director to so deal with the property and franchises of the corporation—to so manage its affairs as would most conduce to the corporate interest, and that he could not perform that duty while contracting with it in his own behalf, or if by possibility his own interest was consistent with the best interest of the company in so contracting, yet, so insidious are the promptings of selfishness and so great is the danger, that it will over-ride duty when brought into conflict with it, that sound policy requires that such contracts should not be enforced or regarded. After an examination of all the cases cited, and such others as I have found, and a careful consideration of the principle and the results of regarding and of disregarding it, I have come to the conviction that the true legal rule is, that such a contract is not void, but voidable, to be avoided at the option of the *cestui que trust*, exercised within a reasonable time. I can see no further safe modification or relaxation of the principle than this. A director of a corporation may have rights not arising out of express contract—such as the right to pass over its railroad, or transport his goods over its canal, on paying reasonable tolls, or to have money which he has loaned it repaid to him; but where the right is one which must stand, if at all, upon an express contract, and which does not arise by operation or implication of law, then he shall not hold it against the will of his *cestui que trust;* for in the very bargain which gave rise to it, in which he should have kept in view the interest of that *cestui que trust*, there intervened before his eyes the opposing interest of himself. The vice which inheres in the judgment of a judge in his own cause, contaminates the contract; the mind of the director or trustee is the forum in which he and his *cestui que trust* are urging their rival claims, and when his opposing litigant appeals from the judgment there pronounced, that judgment must fall.

It matters not that the contract seems a fair one. Fraud is too cunning and evasive for courts to establish a rule that invites its presence. There may be isolated cases in which the trustee is willing to make a contract on more favorable terms for the *cestui que trust* than any one else, but the opportunities for self-advancement, at the expense of those whose concerns he has in charge, and under circumstances where concealment is easy, are so much more numerous than these isolated cases, that in declaring a rule the latter are not worthy of consideration. Nor is it proper for one of a board of directors to support his contract with his company, upon the ground that he abstained from participating as director in the negotiations for and final adoption of the bargains by his co-directors, the very words in which he asserts his right declare his wrong; he ought to have participated, and in the interest of the stockholders, and if he did not, and they have thereby suffered loss, of which they shall be the judges, he must restore the rights he has obtained—he must hold against them no advantage that he has got through neglect of his duty towards them. Many authorities exemplifying the rule may be found. I cite a few only—

*York Building Ass.* v. *Mackenzie*, 8 *Bro. P. C.*, 42 *of Appendix*—4 *Cr. & Stew.* 378; *Aberdeen Railway Co.* v. *Blaikie*, 1 *Macq.* 461; *The York & M. N. R. Co.* v. *Hudson*, 16 *Beav.* 485; *Mulford* v. *Minch*, 3 *Stockt.* 16; *Davoue* v. *Fanning*, 2 *Johns. Ch.* 252; *Cumberland Coal & Iron Co.* v. *Sherman et al.*, 30 *Barb.* 553; *Gardner* v. *Ogden et al.*, 22 *N. Y.* 327; *Butts* v. *Wood*, 37 *N. Y.* 317; *Michoud et al.* v. *Girod et al.*, 4 *How.* 503.

The application of the rule is most frequent in the relations between vendor and purchaser, but its reason and force extend to all agents and trustees, public and private. It has not always presented itself to the minds of judges in its full scope. At times they have been seduced into listening to suggestions that the circumstances of the special case showed the absence of fraud and over-reaching. At other times, they have intimated that the *cestui que trust* must seek his relief in equity;

but the strongest intellects have enunciated the rule with its utmost vigor, and in its broadest extent.

The qualification, however, which the rule undoubtedly has, saves the case before us from its operation. The *cestui que trust* of the defendant director was not the plaintiff, but the Morris Canal and Banking Company. The right of avoidance was one which belonged to that company and its stockholders, and not to the plaintiff. The act of 1871, empowering the canal company to lease, only authorized it to lease the canal, with its boats, property, works, appurtenances, and franchises; and under this power, it could scarcely transfer so peculiarly personal a privilege as this option to avoid a contract. Nor would a transfer of the contract, and all of the canal company's rights under it, carry this right of choice; for that does not spring out of the contract, but out of the fiduciary relation existing between the parties at the time the contract was made. And, moreover, the case shows that, after the lease to the plaintiff, and during all the time in which it is claimed the tolls sued for were accruing, the plaintiff dealt with the defendants on the basis of the binding efficacy of the contaact.

I conclude, therefore, that there appears before us no reason for refusing to give to this contract that force to which our construction of its terms entitles it, and that, upon the case before us, judgment should be rendered for the defendants below, the plaintiffs in error.

*For affirmance*—REED, WOODHULL—2.

*For reversal*—THE CHANCELLOR, DIXON, KNAPP, CLEMENT, DODD, GREEN, LATHROP, WALES—8.