CASES IN CHANCERY, 1921. 131

*92 N. J. Eq.*     Lehigh, &c., Co. *v.* Atlantic S. & R. Works.

LEHIGH STRUCTURAL STEEL COMPANY and DONNELL-ZANE COMPANY, INC.,

*v.*

ATLANTIC SMELTING AND REFINING WORKS et al.

[Submitted May 24th, 1920. Decided August 15th, 1920.]

1. The provisions of a contract between an association representing nearly all the building contractors of New York City and Long Island and an association representing the labor unions of these communities, binding the contractors to employ only union men in their enterprises therein. and having for its object the closed shop and the monopolization of the labor market by the unions, violates public policy as to monopolies.

2. A sympathetic strike, merely to force the employer in other territory to comply with the invalid provisions of such a contract, is without just cause or excuse, and is unlawful.

3. The owner of a building and its architect became parties to a conspiracy to prevent, by means of a sympathetic strike to compel a closed shop at another place, the performance by complainants of their contract to erect the structural steel of the building, where after the strike was called without their knowledge, they, to prevent a general strike, ordered complainant off the job because they were going to complete it with nonunion labor.

4. A building contractor will be allowed an injunction to prevent a breach of contract, rendering performance of the work impossible, by unlawful means and to serve unlawful ends, to the injury of the contractor's business, the remedy at law being inadequate, and the damages being incapable of ascertainment at law.

5. An injunction to restrain interference with the complainant's performance of a building contract by unlawful means and for an unlawful purpose will not be denied because specific performance of the contract may be an incidental result, though because of lack of mutuality of remedy suit for specific performance would not lie.

6. Section 98 of the Corporation act does not reach a contract made out of this state.

7. A contract entered into outside of this state by foreign corporations and to become binding only when accepted by one of them at its home office, does not come within the interdiction of section 98 of the Corporation act because signed by one of the parties to it within this state.

8. The right of a foreign corporation which has not complied with the provisions of section 98 of the Corporation act, to maintain an action in this state on a contract made out of this state, is unaffected by the reciprocity provision of section 101 of the Corporation act where the law of the other state, though more exacting and imposing a mere drastic penalty, penalizes only for contracts made in that state.

On bill, &c.

*Mr. Merritt Lane,* for the complainants.

*Mr. William Harris* and *Mr. Jacob Siff,* for the defendant Atlantic Smelting and Refining Works.

*Mr. John A. Matthews,* for the defendants Tierney and Local No. 11, International Brotherhood of Bridge and Iron Workers of America.

BACKES, V. C.

This bill is to restrain a conspiracy to prevent the performance of a building contract by means of a strike to compel a closed shop.

The Lehigh Structural Steel Company contracted to fabricate and deliver to the Atlantic Smelting and Refining Works, f. o. b. Allentown, Pa., the structural steel for a building at Brills, Newark, and also to erect it. The Lehigh company sublet the erection to Donnell-Zane Company. The steel had been delivered and paid for, and Donnell-Zane had nearly completed the work when its employes, erectors, struck by order of Timothy Tierney, the business agent of Local No. 11, International Brotherhood of Bridge and Iron Workers of America, of which local, of Newark, they were members. Donnell-Zane then declared its intention of employing other available labor which, of course, was non-union, and was notified by William E. Lehman, the architect of the building, and the sole representative and major-domo of the Atlantic company, that it would not be permitted to finish the job with other than union workmen, his stated reason being that there would be a general strike of the allied trades on the works if it were done otherwise. That that

would have followed is common experience and was admitted by Tierney; and that the strike was called, and the general strike would have been brought into play to force the Atlantic company to breach its contract with the Lehigh company if Donnell-Zane persisted in defying organized labor, as hereinafter related, is manifest, and is not controverted. Lehman offered to mediate, but Donnell-Zane, knowing that a settlement meant a compliance with the demands of the unions and a complete surrender to them, would have none of it, and went ahead with non-union labor until stopped by an order of this court on a bill filed by the Atlantic company, alleging that it had been agreed that the work was to be done by union men only. Upon the return of the order to show cause, the restraint was dissolved and the bill dismissed on the ground that the allegation was not sustained by the proofs, and because an agreement to restrict the labor to union men, in the circumstances, would not be enforceable, as being in restraint of trade and against public policy. An effort was then made to settle the matter on a money basis, but this coming to naught, Lehman, for the Atlantic company, served the following notice:

"*To the Lehigh Structural Steel Company:*

"GENTLEMEN—You are hereby notified to cease any further work under contract made between the undersigned and the Lehigh Structural Steel Company for the erection of all structural steel for the refining plant being built for the undersigned on Doremus avenue, Newark, New Jersey. This notice is given to you because you insist upon using non-union labor to complete the said work. The contract herein referred to is the one referred to as 'Our Contract No. 723' in your letter of November 15th, 1919, addressed to the undersigned wherein you agree to do said work for the sum of $2,970.

"ATLANTIC SMELTING AND REFINING WORKS, INC..
                    "By MORRIS BIRENBAUM, *Treas.*"

The complainants thereupon filed this bill reciting the foregoing facts, and further setting up that the strike was ordered to force them, against their will, to conduct their business on the closed shop plan, viz., to employ none but union men. Tierney and Local No. 11 admit and avow this to be their object, and plead in justification that the Building Trades Employers' Association of the city of New York (an association of

nearly all the building contractors of New York), of which the Iron League is a member, and of which league the complainants are members, entered into a contract with the New York Building Trades Council of Greater New York and Long Island (an association of all the trades unions of those localities) on November 20th last, to become effective January 1st, 1920, and to continue one year, whereby the employers' association bound its members to employ only union men in their various building enterprises in Greater New York and Long Island, and certain named additional territory; that the complainants refused to submit to this, and in a given instance, on a building in Forty-fourth street, New York, Donnell-Zane used non-union labor, for which violation the building is now under strike; that the present strike was ordered by Robert P. Brindell, president of the Building Trades Council, and put into execution by Tierney of Local No. 11, for the purpose of compelling Donnell-Zane to comply with the contract. The complainants admit the making of the contract and their refusal to abide its terms, because, as they claim, it was *ultra vires* the employers' association to bind the Iron League and its members, restricting them in the selection of their workmen to members of organized labor, because it was in contravention of public policy, and, therefore, unlawful. At the trial the complainants attempted to show further, that the contract of the employers' association with the building trades council was not binding upon the individual members of the Iron League until they gave bonds, which they had not done. The conclusion I have reached, presently to be stated, makes it unnecessary to pass upon that issue.

The strike is purely sympathetic. Tierney and the men who obeyed his order had no grievance. He supplied them to Donnell-Zane, and wages, hours, and conditions, were satisfactory and according to the union regulations. Local No. 11 was not a party to the New York contract, nor a beneficiary, except in the sense that all locals are benefited by the achievements of the various units of the federation. The men were not under contract, and individually had the right to quit work as it pleased them, and as members of the federation it was their privilege to use the strike in sympathy with the en-

deavors of their New York brethren, and to advance the common
cause of organized labor, provided the motive—that is, the ob-
ject sought to be attained—was not an unlawful one. But the
privilege to strike is not license to strike. Those availing them-
selves of the privilege must respond in damages for the injury
inflicted unless they can show just cause or excuse. The burden
is on them. The lawfulness of the motive for the sympathetic
strike must, then, be sought in the New York situation. Tier-
ney and Local No. 11, in their answer, defend the closed shop
in New York on the ground that the contract between the em-
ployers' association and the building trades council was "a
legitimate, legal, honest contract entered into in due and legal
manner, for the economic betterment of labor union members
and for the more constant and thorough understanding between
capital in this line of business." These generalities are mean-
ingless. If it is meant that the contract was to secure to the
unions a legitimate benefit and advantage in the field of labor,
the proofs are painfully absent. I have looked into the contract
and find nothing to explain the provisions therein for the closed
shop except this dubious foreword: "In order to secure con-
tinuity of employment and uninterrupted production, it is
hereby agreed between the Building Trades Employers' Associa-
tion of the city of New York and the Building Trades Council
of the State of New York representing and having authority to
act for;" then follows the names of thirty-three locals of the
various trades unions in the building line in New York and Long
Island over which the building trades council has jurisdiction,
the hours of work per week, a scale of wages and the closed shop
clause. It concludes with a paragraph that the agreement ap-
plied to all work performed within the geographical limits of
Greater New York and Long Island, and in such additional ter-
ritory as is included in the provisions of the existing trade
agreements between the several trade associations of employers
and the unions of their trades. The closed shop clause is nega-
tive in phraseology, but when read in the light of the laws of the
union, its dominating character is revealed. The caption "To
secure continuity of employment and uninterrupted production,"
as explained by counsel for the union, means simply this: Before

the contract was made the various locals in the Metropolitan district struck for one reason or another *ad libitum,* thus involving the other trades, sympathetically or of necessity, and putting them out of work. To overcome this evil and disastrous consequences to the members of the unions, the organization concluded to minimize their loss of time and wage by synchronizing their strikes. This was a perfectly proper self-serving purpose, but I fail to see how the closed shop provision of the contract which, in effect, precluded non-union men from securing work in their crafts in Greater New York and Long Island, serves to promote that object. "The continuity of employment" could as readily have been accomplished by binding the parties to a performance for the time stipulated. The closed shop feature obviously bears no relation whatever to the other and legitimate purposes of the contract, and it is plain that the primary and ultimate thing organized labor sought was the monopolization of labor in all lines of the building trade within the territory to which the contract applies. As to this there is no question, for the counsel of the union frankly admits the indictment, and asserts that the movement to bring about the closed shop, not only in New York but elsewhere throughout the nation, is within the law.

The principle of the closed shop—*i. e.,* the monopolization of the labor market, has found no judicial sponsor. In whatever form organized labor has asserted it, whether to the injury of employer, or to labor, or to labor unions outside of the fold, the judiciary of the country has responded, uniformly, that it is inimical to the freedom of individual pursuit guaranteed by the fundamental law of the land, and contravenes public policy. On the other hand, public policy favors free competition, and the courts have been keen to recognize the right of organized labor to compete for work and wage and economic and social betterment, and to use its weapon—the strike—to realize its lawful aspirations, but none has gone to the length of sanctioning a strike for a closed shop, which has for its object the exclusion from work of workmen who are not members of the organization. There is a wealth of literature and authority upon the subject in England and in this country. *Walker* v. *Cronin, 107 Mass. 555;*

*Reynolds* v. *Davis, 198 Mass. 294; Snow Iron Works* v. *Chad-wick, 227 Mass. 382; Erdman* v. *Mitchell, 207 Pa. 79; O'Brien* v. *People, 216 Ill. 354; Barnes & Co.* v. *Chicago Typographical Union, 232 Ill. 424; Quinn* v. *Leathem (1901), A. C. 495.* The cases are cited in these authorities and in those hereafter re-ferred to.

In *Folsom* v. *Lewis, 208 Mass. 336,* an injunction was granted restraining a strike called to force the signing of a closed shop agreement. The court said: "The master was, undoubtedly, right in finding that the purpose of the defendants and the real object of the strike were not so much to obtain certain slight ad-vantages referred to in the proposed agreement, as to compel the employers, by inflicting this injury upon them, to submit to an attempt to obtain for the union a complete monopoly of the labor market in this kind of business, by forcing all laborers who wished to work to join the union, and by forcing all employers to agree not to employ laborers, except upon such terms as they could make with the combination that should control all labor in this business. This has been held to go beyond the limit of justifiable competition. Conduct directly affecting an employer to his detriment, by interference with his business, is not justi-fiable in law, unless it is of a kind and for a purpose that has a direct relation to benefits that the laborers are trying to obtain. Strengthening the forces of a labor union, to put it in a better condition to enforce its claims in controversies that may after-wards arise with employers, is not enough to justify an attack upon the business of an employer by inducing his employes to strike." In *Connors* v. *Connolly, 86 Conn. 641,* the hat manu-facturers of Danbury, in settlement of a strike, entered into an agreement with the unions to employ union men only. The plaintiff lost his membership in the union and was discharged by his employer as a result of a threat by the union leaders to call a strike if this were not done, according to the terms of the agreement. In a suit for damages against the union leaders, the contract was relied upon in justification. In dealing with this feature of the defence, Chief-Justice Prentice said that all the authorities were, as far as he had observed, in complete accord in holding "that, where the agreement is one which takes in an

entire industry of any considerable proportions in a community, so that it operates generally in that community to prevent or to seriously deter craftsmen from working at their craft, or workingmen obtaining employment under favorable conditions without joining a union, it is contrary to public policy." He further' said that "the reasons for this conclusion are as evident as they are convincing. 'There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor.' 'The common law has long recognized, as a part of the boasted liberty of the citizen, the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellowmen, saving such as may result from the exercise of equal or superior rights on their part.' Monopolies of things of common use and need, whether created by governmental grant or by the acts of private persons or corporations, are odious, and their existence is contrary to public policy. They were condemned by the common law of England, and, although changing in their more common source, have remained under a like condemnation in that country and in this to this day. They are especially intolerable where they concern the basic resource of individual existence, to wit, the capacity to labor. The whole theory of a free government is opposed to them. Their beneficiaries may enjoy the favors they bestow, and feel injured when deprived of them. But the interest of the public outweighs that of individuals, and the public at large can see nothing but danger in the monopoly of anything of which there is a common need, or which is a common resource of life."

In *Curran* v. *Galen, 152 N. Y. 33*, the local organization of the Knights of Labor had a contract with the brewers of Rochester that no employe should work longer than four weeks without joining the union, and if he failed in this, he was to be discharged. The plaintiff, an employe of one of the brewers, refused to join, and his discharge followed the demand made by the defendants (union leaders) of the employer to comply with the agreement. The contract was set up in justification and was overruled. The court, in a *per curiam* opinion, said:

"Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper, or to restrict that freedom, and through contracts or arrangements with employers, to coerce other workingmen to become members of the organization and to come under its rules and condition, under the penalty of the loss of their position and of deprivation of employment, then that purpose seems clearly unlawful, and militates against the spirit of our government and the nature of our institutions. The effectuation of such a purpose would conflict with that principle of public policy which prohibits monopolies and exclusive privileges. It would tend to deprive the public of the services of men in useful employments and capacities."

In *Berry* v. *Donovan, 188 Mass. 353,* it was claimed by the unions that the closed shop was justifiable in law, on the theory of competition between organized labor and so-called capital for as large a share as possible of the income from their combined efforts in the industrial field. In disposing of this contention, Chief-Justice Knowlton said: "The gain which a labor union may expect to derive from inducing others to join it, is not an improvement to be obtained directly in the conditions under which the men are working, but only added strength for such contests with employers as may arise in the future. An object of this kind is too remote to be considered a benefit in business, such as to justify the infliction of intentional injury upon a third person for the purpose of obtaining it. If such an object was treated as legitimate, and allowed to be pursued to its complete accomplishment, every employe would be forced into membership in a union, and the unions, by a combination of those in different trades and occupations, would have complete and absolute control of all the industries of the country. Employers would be forced to yield to all their demands or give up business. The attainment of such an object in the struggle with employers would not be competition but monopoly. A monopoly, controlling anything which the world must have, is fatal to prosperity and progress. In matters of this kind the law does not tolerate monopolies. The attempt to force all laborers to com-

bine in unions is against the policy of the law, because it aims at monopoly."

Vice-Chancellor Foster, recently, in *Baldwin Lumber Co.* v. *Local Number 560, International Brotherhood of Teamsters, &c., 91 N. J. Eq. 240,* held that coercion, by means of a strike, to compel a closed shop in the employment of teamsters in the lumber trade, in a territory as large as Hudson county, was unlawful, as against public policy. The soundness of his conclusions is evidently convincing to organized labor, for it has denied itself an appeal.

*Curran* v. *Galen* stands as the law of New York on the question of the closed shop to obtain a monopoly of the labor market, although its wide sweep was criticised in the later case of *National Protective Association* v. *Cummings, 170 N. Y. 315.* See *Jacobs* v. *Cohen, 183 N. Y. 207; McCord* v. *Thompson-Starrett Co., 113 N. Y. Supp. 385; Auburn Draying Co.* v. *Wardell, 135 N. Y. Supp. 469; affirmed, 227 N. Y. 1.*

In the cases relied upon by the defence, the policy of the law towards the principle of the closed shop, announced by the foregoing authorities, is not in the last qualified. Upon an examination of these cases it will be found that the unions convinced the court that their motives were intrinsically self-protective, in a lawful way, and not monopolistic of purpose.

*National Protective Association* v. *Cummings, supra,* was a struggle between rival unions. The majority of the court were of the opinion that the motive of the defendant union was the securing of work for its own members, and though the means resorted to were calculated to intimidate the employers of the plaintiffs, they were justified on the ground of lawful competition, and that the injury to the plaintiffs in thus preventing them from working, or getting work, was incidental; whereas the minority opinion held to the view that the defendant's purpose was, through coercing the employer of the plaintiffs by threats of a strike, to drive the plaintiffs' union out of business and altogether eliminate them as competitors—a purpose which was as obvious as it was unlawful. The court simply split on the question of fact as to what the true motive was. Apparently, there was no division of minds as to the law upon either hypoth-

esis. The principle underlying this decision has been variously applied by the New York courts. *Park & Sons Co.* v. *National Druggists Association,* 175 N. Y. 1; *Wunch* v. *Shankland,* 69 N. Y. Supp. 349; 179 N. Y. 545; *Kissam* v. *United States Printing Association,* 199 N. Y. 76; *Bossert* v. *Dhuy,* 221 N. Y. 342; *Gill Engraving Co.* v. *Doerr,* 214 Fed. Rep. 111. In *Erdman* v. *Mitchell, supra,* there was a similar rivalry between two unions and an injunction issued. The court adopted the view that the coercive measures of the defendants' union were intended to eliminate the plaintiffs' union as a contender for work.

*Jacobs* v. *Cohen, supra,* was a suit on a note given as security and to be applied as liquidated damages for breach of a contract which required the defendant to employ in his shop workmen affiliated with a union composed of his employes only—a shop organization. A demurrer to an answer setting up that the contract was in restraint of trade and void on the ground of public policy was sustained. Judge Gray, who wrote the opinion in *Curran* v. *Galen,* distinguishes the two cases thus: "It would seem as though an employer should be, unquestionably, free to enter into such a contract with his workmen for the conduct of the business without it being deemed obnoxious upon any ground of public policy. If it might operate to prevent some persons from being employed by the firm, or, possibly, from remaining in the firm's employment, that is but an incidental feature. Its restrictions were not of an oppressive nature, operating generally in the community to prevent such craftsmen from obtaining employment and from earning their livelihood. * * * Their (workmen) combination is lawful, when it does not extend so far as to inflict injury upon others, or to oppress and crush them by excluding them from all employment, unless gained through joining labor organizations or trade unions. This we have decided, and this the law of the state sanctions." Citing *Curran* v. *Galen.*

In *National Fireproofing Co.* v. *Mason Builders' Association,* 169 Fed. Rep. 259, the mason builders' association and the bricklayers' unions of New York City entered into a working agreement providing, *inter alia,* that the builders must include in

their contracts the fireproofing, and that the installation must not be sublet, and that the union men on the outside walls must be given the work of installing, under a penalty of strike for a breach. The complainant's business was that of manufacturing and installing fireproofing, and, as it was not a builder, it was shut out of installing its wares. The bill was filed to declare the agreement void on the ground that it unlawfully interfered with the complainant's business and property. The bill was dismissed, the court holding that the contract merely favored the members of the unions, who did the more disagreeable outside work, by giving them the pleasanter inside jobs, and that as the object of the combination was to advance the interest of the members of the unions, and not to harm others, though harmful to the complainant's business, it had no ground for complaint.

In *White Mountain Freezer Co.* v. *Murphy, 101 Atl. Rep. 357,* the moulders' union struck for a closed shop, and the bill sought a restraint. The supreme court was asked to rule on certain questions, as matters of law, in advance of the trial. The court refused to rule that a strike for a closed shop constituted a conspiracy, as a matter of law, but held that it established a *prima facie* case of unlawful interference, which may be justified, and that justification was a question of fact, to be determined as a question of law, only, if upon the evidence reasonable men could come to but one conclusion. It also found itself unable to rule that competition was a justification (citing *Pickett* v. *Walsh, 192 Mass. 572*), since there was no evidence of competition before the court to sustain the claim.

*National Fireproofing Association* v. *Mason,* it is argued, is dispositive of the complainants' right to relief, if it is true, as is claimed, that they are not parties to the New York agreement. The difference between the two cases is obvious. In the cited case the plaintiff suffered injury in consequence of a lawful contract entered into between the unions and the builders to secure to the unions certain work in competition with the plaintiff, while here the complainants are victims of a strike, because they refuse to be parties to, or comply with the terms of, an unlawful contract which excludes the employment of non-union men, for which there has not been shown legal cause or excuse. *White*

*Mountain Freezer Co.* v. *Murphy, supra,* clearly indicates the point of cleavage that *prima facie* a strike for a closed shop is unlawful, but may be justified by showing that it was inaugurated to advance the material interests of the unions.

The conclusion upon the case as presented is, that the New York contract violates public policy, and that the sympathetic strike is without just cause or excuse and is unlawful.

Lehman and the Atlantic company say they were not parties to the sympathetic strike, and, consequently, not parties to the conspiracy of the unions. That they were, it seems to me, admits of no doubt. They were, and are, fixed in mind not to allow the work to be done by non-unionists, and to this end brought suit to restrain the complainants, and when they failed, ordered the complainants off the job for no other reason than that they were going to complete it with the labor of the unanointed. Their excuse is that they feared the wrath of organized labor and were acting in self-defence. In other words, they breached their contract to avert a general strike of the trades unions on the work. That that is not a legal excuse for breaching the contract needs no argument. And that it furnishes a legal excuse for joining the oppressors of the complainants is even less defensible. Their protection lies in the law, not in the graces of those who transgress the law. Their further contention that they were moved to their course by causes wholly independent of the motives of the unions, that they were prompted solely by a desire to escape a labor squabble, and to have their building completed expeditiously, is irreconcilable with their activities and the means they used to accomplish the unlawful aim of the unions, in common with the unions, to make the sympathetic strike effective, viz., by preventing the complainants from employing non-union men. Their motive may not have been co-extensive with that of the unions; they may have been wholly indifferent as to the success of the ultimate object of the sympathetic strike, but a common ground upon which they met the unions, a common motive that actuated them, and made them co-conspirators, was the enforcement of the closed shop at Brills.

Lehman and the Atlantic company ask upon what theory they can be deemed co-conspirators, inasmuch as the proofs show the

strike was called by the unions without their knowledge and
without consultation or intimation. The answer is, they joined
the conspiracy later on, after the strike, when, out of fear of a
general strike, they broke their contract to help it along. This
was decided in *Aberthaw Construction Co.* v. *Cameron, 194
Mass. 208*—a case strikingly similar to the one at hand. There
the Christian Science Church contracted with the Aberthaw com-
pany for the construction of an edifice in Boston. The labor
unions insisted that the contractor discharge a non-union man.
The contractor refused and the unions threatened a strike, where-
upon the church ordered the contractor off the job. The bill for
an injunction to restrain interference with the performance of
the contract set up that the purpose of the union was to force the
contractor to employ union men exclusively, and that the church,
bowing to the will of the union, breached the contract. A de-
murrer to the bill assigned as causes that the plaintiff had an
adequate remedy at law, that it was unjust and inequitable that
the contractor and the union should be allowed to fight out their
differences on the church premises, and that there was nothing
alleged in the bill entitling the plaintiff to a remedy in equity.
The demurrer was overruled, and on a reference to a master he
found, *inter alia,* as follows: "I also find that the Christian
Science Board of Directors, one of the defendants, broke the con-
tract existing between said board and the plaintiff, induced
thereto solely through fear of 'trouble,' the meaning of which
word as used in this case I have already defined. I rule, as a
matter of law, that in such action said board acted without any
legal justification. Against the objection and exception of all the
defendants I find as an inference of fact, from the facts already
found, that the Christian Science Board of Directors, together
with the defendants' district council and Cameron, conspired to-
gether to compel the plaintiff to employ only union carpenters
on said job. And I likewise further find that in pursuance of
such conspiracy that they caused a breach of the existing con-
tract of employment between the plaintiff and the defendant
board without any just cause or lawful provocation." On ex-
ceptions, the supreme court sustained the findings of conspiracy
and held that the church became a conspirator within the mean-

·CASES IN CHANCERY, 1921. 145

*92 N. J. Eq.*    Lehigh, &c., Co. *v.* Atlantic S. & R. Works.

ing of the law, when it breached its contract. The court said: "The plans of the other defendants [the unions and its business agent, Cameron] were well on foot when this defendant [the church], who had been informed of their object intervened, and sought by its representations to persuade the plaintiff to avoid all future difficulty, by discharging an employe who had not become obnoxious to the corporation, except by reason of its pecuniary interest that there should be no unreasonable delay in the completion of its church. * * * It is plain that the interview [between representatives of the church and the unions] with the accompanying proposals [that the contractor discharge the non-union workman] was advisory only and not intended to re-enforce or aid in the coercive measures adopted by the unions and their representatives, or to form a part of the measures of active interference which the other defendants were taking to enforce their demand. The ruling that the proposals made at this conference did not make them co-conspirators by participation, therefore, must be sustained. In the general scheme of the conspiracy, the breaking of the contract which subsequently followed was an important element, and when taken in connection with the action of the other bodies [the unions], of which the board had knowledge, the concluding finding that the defendants against whom the bill is prosecuted, 'conspired together to compel the plaintiff to employ only union carpenters,' and 'that in pursuance of such conspiracy they caused a breach of the existing contract of employment between the plaintiff and the defendant board without any just cause or lawful provocation,' was well warranted."

The Atlantic company next takes the stand that the remedy of the complainant Lehigh company is at law for damages, citing *McGann* v. *LeBrecque, 91 N. J. Eq. 307.*

The general rule is that compensation in damages is the relief for breach of a contract, and that the remedy is at law and that the measure of damages is the immediate loss, the incidental losses, which are often the heavier, being regarded as too remote to bring into the calculation. Where, however, as here, the complainants are not suing for a breach, but to prevent a breach of a contract by unlawful means, and to serve unlawful ends, to the

10

injury of the complainants' business, the remedy at law is inadequate. The damages for such an injury are incapable of ascertainment at law, and justice demands that the injury be prevented by injunction. The many instances in which equity has intervened by injunction to restrain injury by strikes testify to the jurisdiction. As to the irreparableness of the injury to the complainants' business by breach of the contract due to the strike, the findings of the master in the *Aberthaw Case* may be profitably quoted: "Any failure of a contractor to fully perform a contract, regardless of the reason or the party in fault, impairs his reputation for efficiency, and, consequently, is a damage to his good-will. Let the fact of a breach become rumored about and it must need be explained. But friendly explanations cannot run co-extensive with rumor spread by thoughtless friends or competitive foes. And then, again, explanations do not always explain. This is especially so in the event of a breach growing out of a labor trouble. If a contractor gets a reputation, however slight and wheresoever the fault, of being unable to get along with his laborers, he is avoided by contractors in other lines of work and by those who contract with the contractors. A labor trouble looked upon merely from a money standpoint, involves financial loss in many directions and its ramification for evil in other ways when set in motion no man can fully tell, beforehand or thereafter. I, therefore, find in this case that a breach of the contract between the plaintiff and the defendant board, without fault on the part of the plaintiff, unless enjoined, would have worked hurt and damage to the good-will of its business, unsusceptible of even approximate computation in money."

Mr. Justice Swayze, in the *McGann Case,* did not intend to question the jurisdiction of equity where the remedy at law is inadequate, but to instruct that in the class of cases he was dealing with the jury and not the chancellor held the yard-stick of the measure of damages, and that the remedy was at law though the injury be irreparable in money.

The Atlantic company further contends that this suit is for the specific performance of a building contract, and that as equity would not entertain jurisdiction to compel the Lehigh company to perform its contract (*Atlantic & S. Ry. Co.* v. *Board of*

CASES IN CHANCERY, 1921.    147

*92 N. J. Eq.*    Lehigh, &c., Co. *v.* Atlantic S. & R. Works.

*Chosen Freeholders of Atlantic County, 84 N. J. Eq. 618*), it will not, at the instance of the complainants, compel the defendant to do so. That there must be mutuality of remedy in specific performance is an established rule of equity, but the rule lacks application. As has already been said, the present bill is not to specifically enforce the contract, though that may be the incidental result of the injunction, but the relief sought is to restrain the defendants from interfering with the complainants' business —the performance of the Brills contract—by unlawful means and for an unlawful purpose.

Technical objection is raised to complainants' right to maintain this suit because they are foreign corporations, and did not obtain certificates from the secretary of state authorizing them to do business in this state before the bill was filed as provided by section 97 of our Corporation act. *Comp. Stat. p. 1657.* The Lehigh company is a corporation of Delaware, and Donnell-Zane is a corporation of the State of New York, and neither obtained the required certificate until after the suit was brought. But that omission does not bar them from suing in this state, if the suit be on a contract, unless the contract was made in this state. Section 98 provides the penalty. It reads that

"until such corporation so transacting business in this state shall have obtained said certificate of the secretary of state, it shall not maintain any action in this state *upon any contract made in this state.*"

It has been repeatedly held that the statute does not reach contracts made outside the state. *Faxon Co.* v. *Lovett Co., 60 N. J. Law 128; D. & H. Canal Co.* v. *Mahlenbrock, 63 N. J. Law 281; Owen & Co.* v. *Storms & Co., 78 N. J. Law 154; Slaytor-Jennings Co.* v. *Specialty Box Co., 69 N. J. Law 214; McMillan Co.* v. *Stewart, 69 N. J. Law 212; Falaenau* v. *Reliance Steel Co., 74 N. J. Eq. 325.*

The contract in this case was made at Allentown, Pennsylvania, the principal office of the Lehigh company. Before it was finally reduced to writing and executed there was letter communication of proposals and acceptances for the material and work between the Lehigh company, at Allentown, and Lehman, the architect, at Newark; and there were also personal negotia-

tions between representatives of the Lehigh company and Lehman, at Newark. When all arrangements had been made, the Lehigh company forwarded the draft of contract in duplicate for the signature of the Atlantic company, a New York corporation, with headquarters in Brooklyn. Instead of being executed at its customary place of business, the treasurer of the company signed it at Newark while on a visit there, and it was from there mailed to Allentown, where it was executed by the Lehigh company. The contract bears the caption over the signatures of the contracting parties "Accepted at Allentown," meaning, as the parties undoubtedly understood, that it was to become binding only when returned and accepted by the Lehigh company at its office in Allentown. A contract entered into outside this state by foreign corporations does not come within the interdiction of the statute because it was signed by one of the parties to it within this state.

It is not to be inferred from what has been said that the present suit would not have been entertained if the contract had in fact been made in this state, for it is questionable whether this suit is an "action" upon a contract. *Falaenau* v. *Reliance Steel Co., supra.* And whether "maintain," as used in the statute means commence, and that an action upon a contract would be defeated unless a foreign corporation had its certificate before suit is begun, is also open to debate. There are authorities holding that the certificate is timely if taken out pending the action. *Thomp. Corp.* § *6720.* The points have been argued in the briefs but they are not ripe for decision.

The reciprocity provision of section 101 of the Corporation act, imposing upon foreign corporations taking out certificates to do business in this state, "the same taxes, fines, penalties, licenses, fees, obligations and requirements of whatever kind" as are imposed by the laws of the state of the foreign corporations upon corporations of this state, if they are greater than those of this state, adds nothing, in the present instance, to the penalty imposed by section 98. The Delaware statute prohibits foreign corporations from doing business in the state "through or by branch offices, agents or representatives located in this state" until certified under penalty of a misdemeanor, &c. *Rev. Code*

*p. 1007* § *2101a.* The privilege is more liberal than ours, in that all contracts are not forbidden, although the penalty is more severe. In New York the penalty for doing business without a certificate is that the offending corporation shall not "maintain any action in this state upon any contract made by it in this state unless before the making of such contract it shall have procured such certificate." *P. L. 1917 ch. 594.* The requirements are more exacting and the penalty more drastic, but the act, like ours, penalizes only for contracts made in the state.

There will be an injunction restraining the strike and the breach of the contract. The form of the injunction will be settled on notice.