Complainant seeks a decree declaring that a certain "closed shop" agreement entered into by it and the defendant Union be canceled as contrary to public policy and, therefore, void. It also seeks incidental relief by way of injunction. *Page 28 
Complainant is engaged in that part of the oyster industry in the Delaware Bay area in New Jersey which has to do with the shucking, packing and marketing of oysters, and for two successive years has signed so-called closed shop agreements with the defendant Union, in both of which the provision with reference to closed shop is:
"It is agreed that all classes of help employed shall be members of the local Union, and only members with paid up due books, or those with original permit cards issued by an officer of the local Union shall continue to work."
In the year 1938 complainant filed a bill practically identical with the one now under consideration, in which complainant asked for the same relief it now seeks, excepting that the second contract is now the subject of attack. The first bill was filed shortly before the first contract expired, so that it would have been impossible to have had a final hearing and decision before the expiration of the contract. It was with this existing situation before complainant that its officers signed the second contract which, under its terms, expires in November of 1940, with the provision that it shall continue from year to year unless one party gives notice to the other of its non-continuance.
A reading of the bill discloses the pleading of many things which are not relative to the present controversy and which complainant did not attempt to prove at the final hearing. For instance, it was alleged in the bill that the Union, by threats and force, compelled non-union laborers to join the Union before being employed in any branch of the oyster industry and cited an incident which, if true, might have sustained the charge. However, the incident referred to, if in fact it occurred, was prior to the first contract, and complainant properly offered no evidence in support thereof. In fact, the evidence all showed that the Union, notwithstanding the provision of its contract, never interfered in any way with the even flow of labor, so that the oyster industry and all employers of labor therein were at all times free to employ whomsoever they chose, without any dictation from the Union, as will hereafter more fully appear. *Page 29 
Casting aside, therefore, the superfluous allegation of the bill, we find complainant avering therein: "that said alleged contract is illegal and void, since it is an unreasonable and improper restraint of trade, in that it is part of the general scheme to maintain a monopoly of the labor market in the entire oyster industry and confine all employment to members of a Union, and then only to members of defendants' Union; that as a result of said alleged restraint of trade, defendants are engaged in an unlawful conspiracy to injure complainant's good will, trade and business."
To this bill of complaint there was added paragraph 28 by way of amendment, which concludes in the following language:
"And your complainant further states that this bill of complaint is predicated solely upon the theory and allegation that said contract is void because it is repugnant and against the public policy of the State of New Jersey."
The facts gathered from the evidence disclose that the extent of the territory embraced within the oyster industry is co-extensive with the Delaware Bay within the boundary lines of the State of New Jersey and extends from the upper reach thereof to the lower reach, including therein Maurice River Cove. Its confines extend from Cumberland county to Cape May county, both included, and in so far as Cumberland county is concerned, takes in the township of Commercial, part of Downe, Laurence and Maurice river. The total value of the industry is $33,000,000, but included therein is the estimated value of lands covered by water and owned by the State of New Jersey and commonly referred to as natural oyster ground. The gross business of the industry is about $3,000,000 per year. It employs approximately 2,200 men and women during the peak of the season, about eighty per cent. of this labor being men.
The business end of the industry may be divided into two parts; first, those who gather seed oysters from the natural beds belonging to the State of New Jersey aforesaid, and who plant them on bottom grounds in the bay, which grounds are leased by the state to the individual lessees. These lessees, in the fall of the year, gather matured oysters from these *Page 30 
grounds and sell them to the other branch of the business, to wit, shuckers. The gathering of seed oysters is done in the spring of the year and this season lasts about three months. The harvesting and gathering of oysters and their sale to the shucking houses covers a season from September until April. The planting and harvesting of oysters is done by boats owned by those engaged in their branch of the industry. In 1939 there were 119 licensed boats, of which only 114 actually operated, each employing from ten to twenty or more men, depending largely on the character of the work being done, i.e., whether gathering or planting. There were ten shucking houses in 1939, one of which started operation in that year and one of which ceased to operate before the expiration thereof.
We have, then, 119 licensed boats, with 114 actually working, and the proof shows that some 51 planters and harvesters have more than one boat. The Union has closed shop contracts with these planter boatmen in the number of 87. It has such contracts with eight of the shucking house owners, including the complainant. The result is, as computed by complainant, that ninety-five per cent. of the entire industry is pledged by contract not to employ anyone other than Union laborers. Defendant says that that percentage is "slightly high" but that it does not "contend that the computations are so variant that the difference affects the considerations which may be thought to rule the case."
The proofs show that the shucking houses employ about 550 men in season and the planter boatmen the remaining number.
The evidence justifies the finding that the village or town of Port Norris, having a population of approximately 2,500 people, and Bivalve, having a population of approximately 600 people, and Shellpile, with a population of some 300 to 400 people, are mainly dependent for employment on the oyster industry, and that while not to the same extent, the adjacent villages, in accordance with their proximity to the Maurice river, are also largely dependent thereon for employment, and that the main source of work other than oystering in some of its branches, is agricultural, while as one goes further inland he comes in contact with Bridgeton, Millville, *Page 31 
Vineland and other cities and villages in Cumberland county, where employment is mainly in glass factories, canneries and clothing factories, but there is no doubt that in so far as Port Norris, Bivalve and Shellpile and the country immediately contiguous thereto is concerned, that the oyster industry is the chief source of employment and income to the inhabitants, whether they be laborers, skilled workers or owners, and that the income derived from the industry supports the inhabitants thereof otherwise engaged in merchandising or whatnot.
The test as to whether these closed shop contracts are void as being monopolistic is their tendency in that direction, but the results flowing from their operation must be considered as indicative of the tendency.
The workers employed by the industry are chiefly negroes and the greater percentage of them come from Maryland and Virginia, the majority from the Eastern Shore of Maryland. Quite a number of these employes return from year to year and those engaged in the shucking business must be skilled, not only in the art of opening oysters, but as that operation is completed, must sort them according to size by throwing them from the shell into pails indicated by the size of the oysters, of which pails there are several placed at the shucking stands. The workers on the boats may be said to require less skill but they must be experienced in the work incident to handling oyster dredges, rigging, c., in order that the crew, as a whole, may work to the best advantage.
At the end of the seasons these migratory workers return to their homes and are recruited for the next season through a message from their employers to one of their number, who gathers them together and reports with them at the designated time and place for their re-employment on the boats or at the shucking houses. For some reason that does not clearly appear, these migratory workers are re-employed each year, even when native help is obtainable. During the working season this migratory help is housed by the employers, at fixed prices charged to them.
It is quite apparent from the above that if this migratory laboring class were not organized and protected by some means the tendency might well be to take advantage of their *Page 32 
dependence by low wages, long hours and poor working conditions, but even so, organization for that purpose, as necessary as it may be, and as lawful as it surely is, may not extend beyond its lawful purpose and adversely affect public interest. The Union may not monopolize the labor market so that one not in its fold may be precluded from seeking, getting and continuing employment.
The allegations of the bill and a reading of the closed shop provision of the contract would indicate that the union requirement as to the right of an employer to hire or a laborer to work depends upon union membership of the employe, but the evidence clearly shows that even though the contract may be said to so read, such is not the interpretation put upon it by the parties thereto.
The system followed is that the planter boatmen or the shucking house owners employ whomsoever they see fit and any number of workers they may require, without the necessity of consulting the Union, and these employes may, after they have been employed, join the Union and obtain a membership card, or they may merely apply for a permit to work. In the former case, the worker receives a union card, with dues of $1 per month; in the latter case, a written permit from the Union at $10 per year. It is customary for the employer to pay the membership or permit fee in the first instance and deduct it from the wages of the employe, but this is not necessary. The employe may pay for his own permit or card and the evidence clearly shows that the Union accepts installment payments to suit the finances of the employe. Union membership or permits are open to all and no one is discriminated against. A boat owner may hire his crew without permit or union card and take them for work down the bay, but on his return the employes must get a permit or membership card. The shucking house owner may work an employe until satisfied of his skill, without card or permit, but as a condition to his continued employment the employe must have a permit or membership card.
From the above it is seen that the Union is in position to demand that no one may continue to be employed in any branch of the oyster industry except as permitee or as a *Page 33 
member of the Union, and the Union controls ninety-five per cent. of the industry in so far as labor is concerned, so that laborers outside of the Union who do not desire to be affiliated by card or permit would, at present, be compelled to seek employment in one shucking house employing at the peak of the season about thirty people, and on eight boats which have not signed the Union contract.
With this situation in view, may there be any doubt that defendant Union has secured a monopoly that in its effect tends to deny employment to a number of the community who otherwise could be employed or seek employment, and may there be any doubt that this condition exists in the entire area embraced within the industry?
It is argued that complainant may not complain in behalf of the individual who might want employment without union affiliation, and that no such complaint is made by any such individual or individuals, and that it must be assumed either that there are no such or at least that they are not harmed by the contract obtained by the Union and their exclusion from employment.
The answer is given by Mr. Justice Garrison inAttorney-General v. Firemen's Insurance Co., 74 N.J. Eq. 372;73 Atl. Rep. 80, and reiterated by Mr. Justice Heher inCameron v. International Alliance, c., 118 N.J. Eq. 11 (atp. 30); 176 Atl. Rep. 692, wherein he said:
"And it does not matter that, at the moment, the junior members have not, in fact, suffered an impairment of earning power by reason of the enforcement of this contract. If it tends to the public injury, it should be annulled without regard to whether public injury had in fact resulted."
We have here a closed shop agreement, the tendency of which was, at the start, monopolistic, but it was not, ipso facto, a contract which in itself has been repeatedly declared to be well without the rights of union labor to demand and enforce, but even so, there were and are certain limitations as to its legality. As to a closed shop contract which does not, by reason of its provision and extent, amount to a monopoly, they are upheld, but the courts have never given sanction to such a contract when monopoly resulted. *Page 34 
Vice-Chancellor Backes, in Lehigh Structural Steel Co. v.Atlantic Smelting and Refining Works, 92 N.J. Eq. 131 (at p.136); 111 Atl. Rep. 376, said in effect, such contract has never had the approval of the courts:
"The principle of the closed shop — i.e., the monopolization of the labor market, has found no judicial sponsor. In whatever form organized labor has asserted it, whether to the injury of employer, or to labor, or to labor unions outside of the fold, the judiciary of the country has responded uniformly, that it is inimical to the freedom of individual pursuit guaranteed by the fundamental law of the land, and contravenes public policy. On the other hand, public policy favors free competition, and the courts have been keen to recognize the right of organized labor to compete for work and wage and economic and social betterment, and to use its weapon — the strike — to realize its lawful aspirations, but none has gone to the length of sanctioning a strike for a closed shop, which has for its object the exclusion from work of workmen who are not members of the organization."
The fundamental law applicable to the facts in this case, not only in New Jersey but in other jurisdictions, has been repeatedly laid down to the effect that the closed shop contract or contracts in substantially the entire industry throughout a considerable area are illegal and void as against the public policy of the State of New Jersey. The Four Plating Co., Inc., v. Mako, 122 N.J. Eq. 298; 194 Atl. Rep. 53; Elkind Sons,Inc., v. Retail Clerks, c., Assn., 114 N.J. Eq. 586;169 Atl. Rep. 494, 495; J. Lichtman Sons v. Leather Workers'Industrial Union, 114 N.J. Eq. 596; 169 Atl. Rep. 498;International Ticket Co. v. Wendrich, 122 N.J. Eq. 222;193 Atl. Rep. 808, 810; Canter Sample Furniture House, Inc., v.Retail Furniture, c., No. 109, 122 N.J. Eq. 575;196 Atl. Rep. 210. See, also, 2 Restatement, Contracts § 515. Brennan v.United Hatters of North America, c., 73 N.J. Law 729;65 Atl. Rep. 165; 9 L.R.A. (N.S.) 254; 118 Am. St. Rep. 727; 9 Ann.Cas. 698; Lehigh Structural Steel Co. v. Atlantic Smelting Refining, 92 N.J. Eq. 131; 111 Atl. Rep. 376, 378; Connors v.Connolly, 86 Conn. 641; 86 Atl. Rep. 600, 604; 54 N.Y. 33; *Page 35 46 N.E. Rep. 297, 298; 37 L.R.A. 802; 75 Am. St. Rep. 496;Berry v. Donovan, 188 Mass. 353; 74 N.E. Rep. 603; 5 L.R.A.
(N.S.) 800; 108 Am. St. Rep. 499; 3 Ann. Cas. 738; Brooks v.Cooper, 50 N.J. Eq. 761; 26 Atl. Rep. 978, 980; 21 L.R.A. 617;35 Am. St. Rep. 739 (Court of Errors and Appeals, 1893);O'Brien v. Musical Mutual Protective and Benevolent Union,c., 64 N.J. Eq. 525; 54 Atl. Rep. 150; Brown v. SupremeCouncil, c., Foresters, 176 N.Y. 130; 68 N.E. Rep. 145, 146;Baldwin Lumber Co. v. Local No. 560, International Brotherhood,c., 91 N.J. Eq. 240; 109 Atl. Rep. 147; McCord v. ThompsonStarrett Co., 129 App. Div. 130; 113 N.Y. 285; Polk v.Cleveland R. Co., 20 Ohio App. Div. 317; 151 N.E. Rep. 808.
It is argued that complainant, having signed two separate contracts containing the closed shop clause, and having filed a bill to set aside the first contract, identical in its charge with the present bill and the relief sought, may not now complain and should be denied relief. If the present litigation were strictly between complainant and defendant Union there would be no hesitancy in refusing relief, but the public interest is that which motivates the decree to be advised.
In Attorney-General v. Firemen's Insurance Co., supra, Mr. Justice Garrison said, as quoted by Mr. Justice Heher inCameron v. International, c., Union, supra (at p. 21):
"The fundamental principle recognized by this line of cases is that one who has entered into a contract that contravenes public policy owes to the public the continuous duty of withdrawing from such contract. A duty thus owing to the public is, upon familiar principles, presumed by courts to be performed, and such presumption should be indulged in by the courts whenever necessary to give to the public, acting through its official representative, the same standing that the actual performance of such duty gives to one in pari delicto to act for the public."
It follows from the foregoing that the decree in this cause must be that the closed shop provision of the contract in question is void and therefore unenforceable. But we have the further insistment by the complainant that the whole contract must fall and that it is not divisible. It seems to me *Page 36 
that as to the other provisions of the contract, i.e., fixing specifications for the measuring cup by which the results of the shuckers' work is to be ascertained, fixing rates of pay and wages and providing for the sanitary conditions for employes and unauthorized deductions from wages, the provision in reference to shop steward and his duties, senior rights, the giving to the Union representative the right of access to the plant and, in general, the other provisions of the contract governing subjects and objects, are and have uniformly been held to be proper subjects and objects of contracts between employer and employe and within the scope of the proper function of labor organizations, and that as to these terms and provisions, the public is not interested and its rights not affected so as to permit complainant to take advantage of the rule above invoked and permit it to escape the contract because of the superior rights of the public to have it terminated as illegal.
There is no evidence to support the theory that the closed shop provision of the contract was intended to be the sine qua non
of the negotiations leading up to its execution, and the other provisions of the agreement are separable.
Mr. Justice Heher, in Cameron v. International, c., Union,119 N.J. Eq. 577 (at p. 589); 183 Atl. Rep. 157, said:
"It is the rule, well grounded in our jurisprudence, that, where a contract contains a promise in reasonable restraint of trade and one in unreasonable restraint, the former promise is enforceable, unless the entire agreement is part of a plan to obtain a monopoly obnoxious to the law."
It is true that complainant herein avers that the purpose of the contract in its entirety was to obtain a monopoly, but there is no proof thereof. The result of the closed shop provision has proved to be monopolistic but with that provision deleted we have a legal and entire contract with reference to subject-matters which deal with the interests of the respective parties to the contract, without interference with the rights of the public. As to divisibility of contract, see: Township of Lodi v. LittleFerry National Bank, 121 N.J. Eq. 213; 189 Atl. Rep. 58; Cameron
v. International Alliance, *Page 37 c., 119 N.J. Eq. 577; 183 Atl. Rep. 157; Katz v. Newman,97 N.J. Eq. 284; 127 Atl. Rep. 255; Feldman v. Gamble, 26 N.J. Eq. 494; Fleckenstein Bros. Co. v. Fleckenstein, 76 N.J. Law 613;71 Atl. Rep. 265; Rosenbaum v. U.S. Credit System Co.,65 N.J. Law 255; 48 Atl. Rep. 237; Fishell v. Gray, 60 N.J. Law 5;37 Atl. Rep. 606; Stewart v. Lehigh Valley Railroad Co.,38 N.J. Law 505; Erie Railway Co. v. Union Locomotive and Express Co.,35 N.J. Law 240; McCarty v. Ennist, 7 N.J. Mis. R. 558;146 Atl. Rep. 653.
As between the parties to this litigation unaffected by the public interest, complainant should be compelled to abide by its contract for the balance of the term. Complainant charges that the execution thereof by Mr. East as president was not the act of a duly authorized officer of the corporation; that its execution, even if authorized, was brought about by duress, i.e., fear of the threatened strike. These allegations were made in the original bill, filed to declare the first contract void, and are repeated verbatim, I think, in this, the second bill, seeking the same relief as to this second contract. As to both assertions of the complainant, I find against them, and the fact to be that Mr. East was fully authorized to bind the corporation by his execution of the contract in question and that he did execute it for the corporation and that the corporation, through its directors, were fully aware of its execution and that they ratified Mr. East's act in the execution of the contract by continuing under its terms, and I find the further fact to be that when Mr. East signed the the contract he was in full possession of his senses, and even if he had been threatened with the strike if he did not sign, that threat was not sufficient in law to permit complainant to escape.
It is further contended by the defendant that this court does not have jurisdiction; that the bill is, in fact, nothing but one for a declaratory decree declaring the contract void; that whether the contract is void is strictly a legal question; that the injunctive relief prayed for is merely incidental and that there is no proof of an overt act or threat on the part of the defendants against complainant which would *Page 38 
justify any injunctive relief, and that a declaratory decree at law would as effectively bring about an abrogation of the contract as would a decree by this court cancelling the contract.
Professor Pomeroy, speaking of the commonly designated "Equitable remedies," said, p. 123 § 110:
"Those which the legal procedure recognizes, but does not directly confer, and the beneficial results of which it obtains in an indirect manner. A familiar example is the relief of Rescission or Cancellation. A court of equity entertains a suit for the express purpose of procuring a contract or conveyance to be canceled, and renders a decree conferring in terms that exact relief. A court of law entertains an action for the recovery of the possession of chattels, or, under some circumstances, for the recovery of land, or for the recovery of damages, and although nothing is said concerning it, either in the pleadings or in the judgment, a contract or a conveyance, as the case may be, is virtually rescinded; * * * It is true, the equitable remedy is much broader in its scope, and more complete in its relief; for its effects are not confined to the particular action, but by removing the obnoxious instrument they extend to all future claims and actions based upon it."
And p. 3282 § 1377, says that the jurisdiction of equity is exercised, but
"where, however, the estate, interest, or right is legal, the jurisdiction always exists, but its exercise depends upon the adequacy of the legal remedies — a party being left to his affirmative or defensive remedy at law, where full and complete justice can thereby be done. The occasions giving rise to the exercise of this jurisdiction are mistake, fraud, and other instances where enforcing instruments or agreements would be inequitable or unjust. A doubt was formerly entertained as to whether a court of equity ought to exercise its jurisdiction to order instruments absolutely void at law, and not merely voidable, to be delivered up and canceled, since the legal remedy of a party was adequate and complete, and no case was presented for equitable interference; but it is now well settled that jurisdiction will be exercised in such cases, except where the invalidity of the instrument is apparent on its face."
It may be that complainant could have sought for and obtained a declaratory judgment in a law court. The mere fact that the legislature so declared did not deprive this court of its inherent jurisdiction to give relief by cancellation and incidental injunction.
The jurisdiction of the court in this class of cases has been upheld in many cases. *Page 39 
In Cone v. Russell Mason, 48 N.J. Eq. 208;21 Atl. Rep. 847, the court said (at p. 216):
"In the first place the complainants are not asking for any affirmative relief by way of advantage from the contract. They are not asking to enforce it and reap its fruits. On the contrary, they are asking to be relieved from its apparent obligations and to prevent any mischief which may be done under it."
Continuing, the court said:
"The complainants come here and confess that they have entered into a contract which they ought not to have entered into, and which was a fraud upon other parties, and they ask the court to declare that it no longer binds them, and that the other parties to it have no rights under it. In short, to aid them to undo, as far as possible, the wrong they have done. It seems to me this court ought not to turn its face from and shut its door against such suitors."
See, also, Attorney-General v. Firemen's Insurance Co.,supra, and Cameron v. International, c., Union, 118 N.J. Eq. 11
(at pp. 20 and 21). In Attorney-General v. Firemen'sInsurance Co., the suit was at the instance of the attorney-general, but the Court of Errors and Appeals cited with approval Cone v. Russell Mason, supra.
It is also argued that the National Labor Relations act has effected a change in the public policy of this state relating to monopolies. Vice-Chancellor Berry dealt with this adversely to complainant's contention in Lora Lee Dress Co. v.International, c., Local, 14 Atl. Rep. 2d 46, and before that in Canter Sample Furniture House, Inc., v. RetailFurniture, c., No. 109, supra.
The decree will be that the closed shop provision of the contract in question is monopolistic and therefore void, and as to that feature, the contract be canceled; that the defendant Union and its officers, members, servants and agents, be restrained from enforcing or attempting to enforce such closed shop provision, but that the remainder of said contract remain in full force and effect.
Complainants are entitled to costs against the defendant Union. Neither side will be allowed counsel fees. *Page 40