## LARX COMPANY, INC. v. CLINTON C. NICOL AND ANOTHER.[1]

### No. 34,235.

### October 11, 1946.

---

[1]Reported in 28 N. W. (2d) 705.

2

*Kingman, Cross, Morley, Cant & Taylor,* for appellant.
*Oppenheimer, Hodgson, Brown, Donnelly & Baer,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Action for a declaratory judgment to have a certain written contract dated December 10, 1935, between Clinton C. Nicol and Barnes-Noble Company, Inc., a corporation, together with written assignments of a certain trademark and copyright pledged as security for said contract, adjudged invalid and unenforceable.

Plaintiff is the assignee of all the right, title, and interest of the Barnes-Noble Company in and to said contract, trademark, and copyright and holds the same subject to Barnes-Noble Company's obligations therein.

On June 21, 1945, the trial court made findings, conclusions, and order for judgment in favor of defendants, in effect holding said

contract and assignments valid and enforceable. A memorandum made by the court on June 12, 1945, was incorporated in the findings and conclusions and made a part thereof. On December 20, 1945, the court denied plaintiff's motion for amended findings and conclusions or for a new trial. From the judgment subsequently entered, this appeal is taken.

The material portions of the contract under attack provide:

"In consideration of the benefits and advantages to be derived by each from the faithful performance of the covenants and agreements hereinafter contained, and One Dollar ($1.00) consideration each to the other paid, the receipt whereof is hereby acknowledged, the transfer and assignment of all certificates of stock in the Barnes-Noble Company, Inc., now held by said second party [defendant Clinton C. Nicol] and a release by said second party of said first party [Barnes-Noble Company, Inc.] from all claim for all salary or bonuses that may be due or owing, and the mutual cancellation of any and all agreements heretofore made by and between the parties hereto, the cancellation of which is hereby acknowledged by both of the parties hereto, it is mutually agreed between the parties hereto, as follows:

"First party for itself, its successors and assigns, hereby agrees to pay second party, his heirs, executors, administrators and assigns Two Hundred Dollars ($200.00) on the delivery of these presents and Two Hundred Fifty Dollars ($250.00) monthly thereafter during the continuance of this contract; said monthly payments shall be divided into two equal installments, due respectively on the First and Fifteenth day of each month hereafter, the first of said semi-monthly payments shall be due January 1, 1936.

"Second party, for himself, his heirs, executors, administrators and assigns agrees that he will not enter into or engage in any business of manufacturing or selling, nor in any manner be associated with, a business of manufacturing or selling any abrasive scouring powder, or competitive product to 'Brite-Ize Cleanser' so long as this agreement shall remain in full force and effect, and will not sell or assign said Copyright or Trade Mark.

"It is further agreed that first party has assigned Trade Mark No. 94053 and Copyright or Registration of Label No. 42256, to second party as collateral security for the performance by first party of its covenants and agreements herein contained.

"It is further mutually agreed that in the event first party, its successors or assigns fail to make the payments or perform the covenants on its part to be performed, for a period of forty-five (45) days, that its rights under this contract shall be forfeited at the option of said second party, and all its rights in and to said Copyright or Registration of Label, and Trade Mark, assigned as aforesaid, shall become the absolute property of second party; that notice of such forfeiture, signed by second party, addressed to first party at its last known place of business, postage prepaid and registered under the then existing postal regulations, shall constitute a good and sufficient notice of the exercise by second party of his option to declare this contract forfeited.

"It is further mutually agreed, that in the event said second party shall fail to perform each and every of his covenants herein contained, that all his rights, title and interest under this contract shall immediately become forfeited and terminated and his rights in and to said Trade Mark and Copyright or Registration of Label, so assigned to him, shall be and become forfeited and terminated."

Accompanying said contract were two written assignments, one for the trademark and one for the copyright referred to. They both provided in substance that in consideration of the sum of one dollar and other good and valuable considerations the Barnes-Noble Company sold, assigned, and transferred unto the said Clinton C. Nicol its entire right, title, and interest in and to said trademark and copyright and the registration numbers thereof, together with the good will of the business in connection with which they were used. Subsequent to the execution thereof, Nicol notified the Barnes-Noble Company by letter that his revenue from the December 10, 1935, contract was thereby assigned to his wife, the defendant Leila M. Nicol, and thereafter all checks under said agreement were delivered to her.

On January 14, 1945, by written agreement, Curtiss G. Noble, who with his wife then owned all but two shares of the stock of the Barnes-Noble Company, for $30,171.13 sold and assigned to plaintiff the aforesaid trademark and copyright; the good will of the business conducted by the Barnes-Noble Company; the right to use the name Barnes-Noble Company for a limited time; the factory improvements, furniture, and fixtures owned by said company; and also the contract between the Barnes-Noble Company and Clinton C. Nicol dated December 10, 1935. Said agreement further provided:

"Seller covenants and agrees that he will not hereafter disclose to anyone the formula pursuant to which Barnes-Noble Company has been manufacturing and selling the scouring compound known as 'BRITE-IZE.'

"Seller covenants and agrees that there is no default on the part of the Barnes-Noble Company or himself insofar as said Clinton C. Nicol contract is concerned, and seller makes no representation regarding the validity of such contract."

Shortly after the execution of the aforesaid sale and assignment to plaintiff, the latter instituted this action.

Plaintiff contends that the trial court erred in finding the contract and assignments of December 10, 1935, valid, and he asserts that all of the same are invalid or unenforceable for the following reasons: (1) That under the law of Illinois, where the contract was made, Nicol's agreement not to compete for an unlimited time in an unlimited space was in unlawful restraint of trade and rendered the contract invalid; (2) that said contract is unsupported by legal consideration and is vague, indefinite as to duration, and unconscionable; (3) that the trademark and copyright were illegally assigned because their assignment was unaccompanied by an actual transfer of the business and good will with which they were associated; (4) that the assignment of the monthly payments from Nicol to his wife constituted a transfer of the trademark and copyright in violation of the contract and accordingly terminated it.

During the year 1931, Clinton C. Nicol developed a formula for a cleansing or scouring compound and commenced the manufacture and sale thereof in Minneapolis in 1932 under the name "Nicol Cleanser." The ingredients of the compound and their proportions were unknown to anyone except him, although the formula, for obvious reasons, was not registered in the United States patent office. He acted as both manufacturer and salesman in his business and by 1933 was selling the compound in substantial quantities.

In 1933, the Barnes-Noble Company was incorporated in Minnesota and commenced selling a compound similar to Nicol's. It found, however, that Nicol's compound had greater sales possibilities, and during the year 1933 it entered into negotiations with him for the use of his formula. An oral agreement was reached under which Nicol turned over and disclosed to the corporation his formula and business, for which the corporation agreed that it would pay him $500; assign him one-fourth of its outstanding stock after an additional $10,000 had been invested in the corporation by one of its officers; and place him in charge of its manufacturing plant on a salary commencing at $150 per month, "to be increased as the company went along."

Thereafter the corporation commenced the manufacture and sale of the cleansing compound made pursuant to Nicol's formula. It purchased from some other concern the right to use a trademark known as "Brite-Ize" and a copyrighted label, and manufactured and sold the compound under such trademark and label. It maintained its plant and offices in Minneapolis until February 1935, at which time it moved to Ottawa, Illinois, where it continued in business. In 1933 its gross sales were $28,000. It continued in business until the sale to plaintiff made on January 14, 1945. By 1943 its sales had increased to $119,000, and its sales activities then extended into 15 states. Its subsequent sales were not disclosed.

Nicol continued with the corporation in Illinois until December 10, 1935, the date of the agreement. In 1933, one Thomas F.

8

Barnes, who then held about one-fourth of its stock, had determined to sever his connections with the corporation and produce and sell the cleanser on his own behalf in 11 western states assigned to him. He sought to have Nicol leave the corporation and go with him. Noble, as president, desired Nicol to remain with the corporation and promised that if he did so the stock owned by Barnes would be transferred to him and that he could continue on a permanent basis at an increased salary. Based upon such promises, Nicol decided to remain. Barnes's stock was never reissued to him, however, although he frequently demanded the same.

On December 10, 1935, the agreement between Nicol and Barnes-Noble Company was executed at Ottawa, Illinois. Three-fourths of the outstanding stock of the corporation was then held by Noble and his wife and one-fourth by Nicol. Barnes's stock had never been reissued. The evidence does not disclose whether the original promises made by Noble in behalf of the corporation, including those relating to the $10,000 investment and to Nicol's employment, had been fully performed. Hence, it is not clear whether the exclusive right to the use of the formula was vested in the corporation or whether Nicol, because of unfulfilled promises, still retained an interest therein on December 10, 1935. The contract of that date provided for a "mutual cancellation of any and all agreements heretofore made by and between the parties" thereto. If this was intended to cover the cancellation of the original agreement of 1933 whereunder the formula was to be transferred by Nicol to the corporation, it would permit the former to again engage in the manufacture of the compound pursuant to such formula. In any event, to eliminate this possibility and to insure to the corporation the exclusive right to use the formula, the December 10 agreement was executed. Therein Nicol covenanted not to use it, directly or indirectly, in competition with the corporation, and the corporation agreed to pay him $250 a month in consideration therefor.

Pursuant to this agreement, Nicol transferred and delivered to the corporation all his stock therein, including as well all his in-

terest in and to the stock formerly held by Barnes. He then withdrew from the corporation, and at no time since has he engaged in a competitive business therewith or in any way violated the terms of the agreement, unless the assignment of the payments thereunder to his wife be regarded as a violation thereof. To date, all payments required under the agreement have been made by Barnes-Noble Company or by plaintiff.

■ We are of the opinion that the validity of the contract and the assignments which are a part thereof are governed by the common law of Illinois. The rule is well settled that the law of the place of contracting determines the validity and legal effect of a contract. It is expressed in Restatement, Conflict of Laws, § 332, as follows:

"The law of the place of contracting determines the validity and effect of a promise with respect to

*    *    *    *    *

"(e) fraud, illegality, or any other circumstances which make a promise void or voidable;"

The Minnesota cases appear to be in accord with the Restatement. See, Schultz v. Howard, 63 Minn. 196, 65 N. W. 363, 56 A. S. R. 470; Thomson-Houston Elec. Co. v. Palmer, 52 Minn. 174, 53 N. W. 1137, 38 A. S. R. 536; Swedish-Am. Nat. Bank v. First Nat. Bank, 89 Minn. 98, 94 N. W. 218, 99 A. S. R. 549; Modern Brotherhood v. Quady, 175 Minn. 462, 221 N. W. 721, 59 A. L. R. 162. Here, the contract was made, executed, and delivered in Illinois. The parties to it at that time resided there. The business of the corporation and all its assets were located there. It is reasonable to assume that the parties intended that the law of that state should govern.

■ Plaintiff asserts, however, that, since performance of the covenant not to engage in a competitive business relates to Minnesota as well as other states, the law of each state should govern as to the enforcement or validity thereof. It is true, some courts have held that the law of the place of performance governs as to the validity of a contract unless a contrary intent appears. 17 C. J. S., Contracts, § 12. In Restatement, Conflict of Laws, § 358,

however, the law of the place of performance is said to apply only to questions relative to the manner, time, location, and sufficiency of performance; the parties by whom or to whom performance shall be rendered; and the excuse for nonperformance.

The general rule first stated would not be applicable here, not only because of doubt as to whether the law of the place of performance applies to questions of validity under the doctrine expressed in the Restatement, § 358 (see, 13 Minn. L. Rev. 551), but for the further reason that the covenant not to compete relates not only to Illinois and Minnesota, but to all other states as well. Where the place of performance covers several states or countries, the courts generally have held, in the absence of evidence to the contrary, that the parties to a contract have intended that the law of the place of contracting should govern as to questions of validity and legal effect. See, Carson Nat. Bank v. American Nat. Bank, 225 Mo. App. 948, 34 S. W. (2d) 143; Smith v. Campania Litografica de la Habana, 127 Misc. 508, 217 N. Y. S. 39, affirmed, 220 App. Div. 782, 222 N. Y. S. 902; Bernstein v. Lipper Mfg. Co. 307 Pa. 36, 160 A. 770. Based upon careful consideration of the foregoing authorities, we must conclude that the law of Illinois governs the question of the validity and legal effect of the contract here involved.

■ Illinois holds generally that an agreement wherein an employe binds himself for an *unlimited time* not to engage in a particular business or trade is valid if such agreement includes a territorial or space limitation. Such contracts are generally construed to extend only throughout the lifetime of the employe. See, Pelc v. Kulentis, 257 Ill. App. 213. It is equally well settled in Illinois that such an agreement, *unlimited both as to time and territory, is invalid as contrary to public policy.* Lanzit v. J. W. Sefton Mfg. Co. 184 Ill. 326, 56 N. E. 393, 75 A. S. R. 171; Union Strawboard Co. v. Bonfield, 193 Ill. 420, 61 N. E. 1038, 86 A. S. R. 346; Tarr v. Stearman, 264 Ill. 110, 105 N. E. 957; Parish v. Schwartz, 344 Ill. 563, 176 N. E. 757, 78 A. L. R. 1032.

■ These decisions, however, do not relate to covenants not to engage in competitive industries or trades involving secret processes. Here, it is to be noted that Nicol bound himself not to enter into, engage in, or be associated with any business of manufacturing or selling a competitive product of "Brite-Ize" cleanser which was made by his employer, the Barnes-Noble Company, under a secret formula originally disclosed to it by Nicol. The business of Barnes-Noble Company at that time extended to some 15 states, and it also had granted to Barnes rights in some 11 additional states. It is reasonable to assume that it intended ultimately to sell its product throughout all states and that it sought protection of its secret formula with that in view. The majority of courts recognize the validity of an agreement wherein the seller of a secret process, or an employe to whom a secret formula has been disclosed in connection with his employment, covenants not to disclose or make use thereof, either directly or indirectly, in competition with his employer or the owner thereof, even though such agreements be unlimited as to time and space. The test applied is the reasonableness of the restraint imposed, and where the business sought to be protected is nationwide a covenant unrestricted as to time and territory is not necessarily unreasonable. C. F. Simmons Medicine Co. v. Simmons (C. C.) 81 F. 163; Harrison v. Glucose Sugar Ref. Co. (7 Cir.) 116 F. 304; Thibodeau v. Hildreth (1 Cir.) 124 F. 892; Coca-Cola Bottling Co. v. Coca-Cola Co. (D. C.) 269 F. 796; Wark v. Ervin Press Corp. (7 Cir.) 48 F. (2d) 152; A. O. Smith Corp. v. Petroleum Iron Works Co. (6 Cir.) 73 F. (2d) 531; Eastman Kodak Co. v. Powers Film Products, Inc. 189 App. Div. 556, 179 N. Y. S. 325; Clark Paper & Mfg. Co. v. Stenacher, 236 N. Y. 312, 140 N. E. 708, 29 A. L. R. 1325; Morse Twist Drill & Machine Co. v. Morse, 103 Mass. 73, 4 Am. R. 513; Central Transp. Co. v. Pullman's Palace Car Co. 139 U. S. 24, 11 S. Ct. 478, 35 L. ed. 55; 17 C. J. S., Contracts, § 252; Nims. Unfair Competition and Trade-Marks (3 ed.) §§ 149, 150.

The courts have uniformly enjoined the violation of such covenants and restrained the defaulting party from engaging in a business from which he has agreed to refrain or from disclosing trade secrets, processes, or formulas belonging to another. Westervelt v. National P. & S. Co. 154 Ind. 673, 57 N. E. 552; Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 A. S. R. 442; O. & W. Thum Co. v. Tloczynski, 114 Mich. 149, 72 N. W. 140, 38 L. R. A. 200, 68 A. S. R. 469; Salomon v. Hertz, 40 N. J. Eq. 400, 2 A. 379; Victor Chemical Works v. Iliff, 299 Ill. 532, 132 N. E. 806. In Nims, Unfair Competition and Trade-Marks (3 ed.) § 149, the rule is expressed as follows:

"* * * Where the contract of employment includes a clause binding the employee not to impart to anyone the knowledge he gains through his employment except by order of his employer, the law enforces that clause. It is not against public policy or in restraint of trade. * * * The object of the court in upholding it, is to preserve the employer's property in the secret. 'Courts of equity will restrain a party from making a disclosure of secrets communicated to him in the course of a confidential employment; and it matters not in such cases whether the secrets be secrets of trade or secrets of title or any other secrets of the party important to his interests.' "

While it is true that Nicol did not acquire knowledge of the secret process for the cleanser while in the employ of the corporation, it is clear that the latter acquired rights therein either exclusively or in conjunction with him and therewith the accompanying right to protect the secret thus acquired by means of the contract now attacked. This rule is expressed in Nims, Unfair Competition and Trade-Marks (3 ed.) § 156, as follows:

"Whether nominated in the agreement of the transfer or not, the vendor of a secret will not be allowed to impart the secret to a third person after the transfer. The law holds the right conveyed to be exclusive even of the vendor himself, and an injunction will issue against the vendor, or any one of his family or associates

who learn the secret through their relations with him, forbidding them to disclose it. * * *

\* \* \* \* \*

"Upon the sale of a secret process, a covenant, express or implied, that the seller will not use the process or communicate it to any other person, is lawful, because the process must be kept secret in order to be of any value, and the public has no interest in the question by whom it is used."

In C. F. Simmons Medicine Co. v. Simmons (C. C.) 81 F. 163, *supra,* defendant agreed that he would not make or sell any medicine manufactured by plaintiff or reveal the secret of its composition *at any time or in any state* (except a few specified states for local consumption) subsequent to the termination of his employment by plaintiff. In upholding this agreement, the court stated (81 F. 165):

"As to the invalidity of the contract, in its being in restraint of trade, the various decisions of the supreme court of the United States are conclusive that such a contract, entered into under the circumstances under which this contract was made, is not void as being in restraint of trade."

In Coca-Cola Bottling Co. v. Coca-Cola Co. (D. C.) 269 F. 805, the court stated:

"The Georgia corporation was at the time of the execution of the contract the sole and exclusive owner of the secret process * * * under which it had long been engaged in the manufacture and sale of a syrup * * * known to the public by the name Coca-Cola. * * *

"A sale of the process might have been accompanied by a covenant that the seller would not thereafter use the process or communicate it to any other person. Such a covenant would have been valid and binding."

In A. O. Smith Corp. v. Petroleum Iron Works Co. (6 Cir.) 73 F. (2d) 539, the court stated:

"* * * The defendant had sought in many ways to obtain the knowledge necessary to enable it to compete successfully with the plaintiff * * *. It finally engaged Hawthorne, who for many years had been employed in the plaintiff's welding department, and who was under express contract not to divulge any information received by him during his confidential relationship to the plaintiff. * * *

"One contention remains to be noted. The defendant urges that Hawthorne's employment contract was invalid because, being one of many similar contracts made by the plaintiff with its engineers, it was in unlawful restraint of trade. It is only necessary to say that contracts of this character have frequently been enforced, * * *."

Illinois has recognized the distinction between covenants involving trade secrets and those without such qualification. In Victor Chemical Works v. Iliff, 299 Ill. 532, 132 N. E. 806, *supra*, it reversed the decision of the trial court enjoining defendant from disclosing secret processes alleged to have been acquired while in the employ of plaintiff because of its conclusion that the evidence did not sustain a finding that the processes were secret. It implied, however, that, had trade secrets been involved, the lower court's determination might have been upheld. Therein it stated (299 Ill. 551, 132 N. E. 813):

"The contract is one in restraint of trade and void. * * * The restraint is unlimited as to time and place, and the proof does not show that complainant has any trade secret whatever."

Under the foregoing authorities, we are satisfied that if the covenant here attacked related to a trade secret it would be held reasonable and valid by the Illinois courts even though unlimited as to time and space, and that, had Nicol violated the same by commencing the manufacture of a cleanser pursuant to the secret formula, the Illinois courts, upon demand of plaintiff, would have properly enjoined him therefrom.

Plaintiff contends, however, that the formula for "Brite-Ize" cleanser was in reality not secret and that the finding of the trial

court to such effect is not sustained by the evidence. In support of this contention, it points out that Nicol, on cross-examination, admitted that competitors of Barnes-Noble Company, as a result of an analysis made by them, had found out the ingredients. It asserts further that it is common knowledge that chemists may quickly analyze such a product and ascertain its composition so that it could not properly be held to be a secret.

The evidence discloses that the original formula was compiled or discovered by Nicol after considerable experimentation and labor extending over a period of approximately two years. The work included a study of books on chemistry, detergents, alkalis, and oils. He worked in his basement at home, where he mixed and tried innumerable combinations and finally came upon the formula subsequently disclosed to Barnes-Noble Company. The secret was not related to anyone except that corporation. That its officers regarded it as secret and of value is evidenced not only by the original agreements between it and Nicol, but by the subsequent agreements between it or its officers and plaintiff, in particular the agreement of January 14, 1945, between its president and principal stockholder and plaintiff wherein the former covenanted and agreed that he would not thereafter "disclose to anyone the formula pursuant to which Barnes-Noble Company has been manufacturing and selling the scouring compound known as 'Brite-Ize.'"

Nims, in his work on Unfair Competition and Trade-Marks (3 ed.) §§ 142 and 146, sets forth the applicable rules with reference to protection of trade secrets as follows:

"§ 142. There is no statutory protection of one who makes an article by a secret process or private formula. He may have a property right in it, but he has no special property right similar to the right of the owner of a patent or copyright. His secret is valuable only because of its being a secret, and only so long as he keeps it secret. The general public is free to find it out, by any fair and honest method. *Nevertheless the owner may protect himself in equity, against discovery by breach of confidential relation.*

"An owner of a secret is protected against a breach of contract by which his secret is betrayed." (Italics supplied.)

"§ 146. * * * Communicating secret information to many persons in confidential relationship with the owner of the secret under a contract not to make the information generally public is not publication. Even the distributing of such information to a number of customers paying therefor is not publication."

In A. O. Smith Corp. v. Petroleum Iron Works Co. (6 Cir.) 73 F. (2d) 538, *supra,* the court stated:

"* * * A process may * * * be maintained in secrecy and be entitled to equitable protection even though invention is not present. * * * Quite clearly discovery is something less than invention. Invention requires genius, imagination, inspiration, * * *. Discovery may be the result of industry, application, or be perhaps merely fortuitous. The discoverer, however, is entitled to the same protection as the inventor. * * *

"The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer. * * * We think the court below was right in rejecting the master's application of the law in respect to those secret processes held by the master to be invalid for the reason that they were in the public domain, or within the reach of the skilled mechanic in the trade."

From the foregoing, it is clear that, even though a secret process not protected by patent or copyright be subject to analysis or discovery by others, and, even though others not bound by contract or confidential relationship may legitimately establish or analyze the ingredients comprising the same, the owner thereof may nevertheless protect his property rights therein against *one lawfully*

*bound by contract* not to disclose, publish, or use such formula or process, and in equity may enjoin him from doing so in violation thereof.

It is true that under the contract Nicol covenanted not to engage in any competitive business either in the use of the formula or otherwise. That portion of the agreement wherein Nicol agreed not to engage in *any* competitive business, aside from the formula, would not prevent enforcement of the provisions therein relating to the use of the *secret* formula under Illinois decisions. The Illinois court has held that the invalidity of an independent covenant in a contract does not prevent enforcement of other valid provisions therein. Thus, in Pelc v. Kulentis, 257 Ill. App. 213, the defendants had agreed that they would not engage in any retail grocery and meat business in North Chicago and had further agreed that they would not engage in *any other* kind of business in North Chicago within a certain area. The court held that even though the second covenant might be illegal, plaintiffs were entitled to enforcement of the first provision. Therein the Illinois court stated (257 Ill. App. 219):

"* * * The rule upon this subject is that if a contract is made consisting of two or more covenants, upon a valuable and legal consideration, and one of the covenants is illegal and the other is legal, if the covenants are so distinct that the portion which is legal may be severed from that which is illegal, so that each covenant may be considered as a distinct contract, the legal covenant can be enforced, and that which is illegal, disregarded."

Under the authority cited, we are of the opinion that the contract of December 10, 1935, insofar as it limited Nicol in the use of the secret he had discovered and permitted the corporation exclusive use thereof, is valid and enforceable.

■ Plaintiff asserts that the agreement is without adequate consideration. In support of this it states that the stock transferred by Nicol at the time such agreement was made was worthless and that his waiver of salary claims was of no value, since all salary had previously been paid to him.

We feel that plaintiff's contention with respect to the stock is not well taken and that the transfer thereof alone formed sufficient consideration for the contract. Apparently it had some value, for the sales were increasing and the corporation was continually opening up additional territory. After its transfer, sales increased until at the time of the trial they exceeded $119,000 per annum. Whether the stock had any book value it is not necessary to determine. It may have had value for transfer of the corporation as a unit, because of anticipated profits, because of contemplated mergers, or because of other like factors not ordinarily reflected in the books of a corporation. Ultimately, all the assets of the corporation were sold to plaintiff for $30,171.13. The officers of Barnes-Noble Company had access to the books and records and were more familiar therewith than was Nicol. There is no question of fraud or overreaching. It is well settled in Illinois that, in the absence of fraud, the courts will not inquire into the adequacy of the consideration supporting agreements of this nature. Tarr v. Stearman, 264 Ill. 110, 105 N. E. 957; Ryan v. Hamilton, 205 Ill. 191, 68 N. E. 781; Linn v. Sigsbee, 67 Ill. 75.

■ We are of the opinion that the portion of the agreement and the assignments which relate to the transfer of the trademark and the copyrighted label as collateral security for the obligations set forth in the contract are valid and binding. It is true, the rule has been expressed that the transfer of a tradename is effective only when accompanied by the transfer of the product or business with which it has been identified. In re Leslie-Judge Co. (2 Cir.) (1921) 272 F. 886. The present assignments do not appear to be in violation of this rule. The contract provides that they are made as collateral security for the performance by Barnes-Noble Company of its obligations under the contract, and that, in the event it should fail for a period of 45 days to make the payments or perform its covenants thereunder, Nicol, at his option and upon giving the written notice specified, should become the absolute owner of the trademark, copyrighted label, and good will. At that

time the transfer to him becomes complete under the agreement and gives to Nicol therewith the right to:

(1) The exclusive use of the trademark "Brite-Ize" and of the copyrighted label used in connection therewith;

(2) Manufacture and sell an abrasive made pursuant to the secret formula originally developed by him and to affix and attach thereto the trademark "Brite-Ize" and the copyrighted label covered by the assignments;

(3) The good will of Barnes-Noble Company.

It would seem that the foregoing constitutes a sufficient transfer of the product with which the trademark, label, and good will have been identified to bring the completed transaction within the general rule above set forth, even though the remaining physical assets of the corporation were not likewise transferred. When and if the transfer becomes complete, all rights of Barnes-Noble Company and its successor to the use of the trademark and label will cease, and Nicol will have exclusive right to manufacture and sell under the trademark and label the product with which they have become identified. Possibly he might be required to indicate that he, and not Barnes-Noble Company, was the manufacturer of the cleanser, but otherwise his use of the trademark and label would be unrestricted. It is of interest that the original transfer of the trademark and copyrighted label to Barnes-Noble Company was separate from the business and good will of the original transferor or any product with which they previously had become identified.

In Coca-Cola Bottling Co. v. Coca-Cola Co. (D. C.) 269 F. 796, *supra,* the court recognized the right of a corporation to transfer an interest in the good will, trademark, and tradename of a Georgia corporation separate and apart from its physical assets, holding that as long as the transferee could use them in connection with the product with which they previously had been identified such transfer was sufficient. The court there stated (269 F. 806, 810):

"A trade-mark is not a right in gross or at large. . As an abstract right, wholly disassociated from the business or merchandise

with which it has become established, it is not property, and may not be assigned. * * * For no one may sell his goods as the goods of another. Such an act would be a fraud upon the public. But, where the trade-mark of a retailer is assigned by him to the manufacturer of the commodity to which the trade-mark was affixed, there is no false representation to the public, and such assignment is valid. * * * The last proposition arises, apparently, from the fact that a trade-mark does not as a matter of necessity and law import that the articles upon which it is used are manufactured by the user. It is sufficient that they are manufactured for him, that he controls their production, or that in the course of trade they pass through his hands. Nelson v. Winchell & Co., 203 Mass. 75, 89 N. E. 180, 23 L.R.A.(N.S.) 1150; McLean v. Fleming, 96 U. S. 245, 253, 24 L. Ed. 828. * * *

\*　\*　\*　\*　\*

"* * * The right to transfer the good will is clear. The Georgia corporation had acquired a good will and a trade-mark arising out of and connected with the fountain drink. * * *

"* * * The right to transfer the good will and trade-mark under such circumstances is shown by the authorities hereinbefore referred to. As I see it, it is immaterial whether the interest in the trade-mark acquired by the bottlers was a legal title or merely a beneficial interest."

As stated in E. F. Prichard Co. v. Consumers Brg. Co. (6 Cir.) 136 F. (2d) 512, 519 (certiorari denied, 321 U. S. 763, 64 S. Ct. 486, 88 L. ed. 1060):

"* * * a trade name, like a trade-mark, may be assigned, licensed, or lent, as long as it remains associated with the same product or business with which it has become associated in the public mind."

In 30 Mich. L. Rev. 489, at pp. 495, 497, Professor Grismore in his article entitled *The Assignment of Trade Marks and Trade Names* comments upon this question as follows:

"If deception of prospective customers is likely, then a sound public policy prohibits the transfer [of good will identified with a

trade mark], unless it is accompanied by such safeguards as will prevent the threatened deception. As applied to the transfer of that good will which is bound up with a trade mark or trade name, this means that the transfer will be effective only provided the connotation of the name or mark after the transfer is still true, as it was before the transfer; or that the transferee in his use of it makes clear the changed meaning. * * *

"An examination of the decided cases will, it is believed, make clear that this is in fact the full extent of the limitations on the assignability of trade marks and trade names, in spite of many obiter dicta to the contrary. * * *

* * * * *

"* * * if the assignee makes it clear, in his use of the mark, that the goods are no longer made by the original user of the mark, then there would seem to be no good reason for not giving effect to the assignment, *even though no physical assets have been transferred along with the good will symbolized by the mark.* There is no good reason why the assignee should not get what benefit he can from the fact that he is enabled to represent himself as the successor of the original user of the mark, or why the latter should not be allowed to profit financially by permitting such a representation." (Italics supplied.)

Based upon the foregoing authorities, we hold that the assignments of the trademark, copyrighted label, and good will are valid, and that Nicol, upon the completion of the transfer thereof under the contract, may use such trademark and label in conjunction with the manufacture and sale of a cleansing product made pursuant to his original formula, provided, of course, he specifies that the product is made by him rather than by the original user of the trademark.

■ Under the contract, Nicol agreed not to assign or sell the copyright or trademark and further agreed that a violation of any of the covenants in such contract would terminate all of his rights thereto. Shortly after the execution of the contract he wrote a letter to Barnes-Noble Company setting forth:

"* * * I have this date assigned my revenue from the contract dated December 10, 1935, between myself and the Barnes-Noble Co. to my wife, Leila M. Nicol, effective this date. Kindly mail all checks for royalty under my agreement to her."

Plaintiff asserts that this constituted an assignment of the trademark and copyrighted label in violation of the foregoing agreement and, accordingly, terminated Nicol's rights thereunder. We do not regard the foregoing as an assignment of the trademark or copyrighted label. It was not accompanied either by a transfer of the formula for making the cleanser with which the trademark and label had become identified or the good will attached thereto. (See subdivision 7 of this opinion.) The language of the letter speaks for itself. It indicates clearly that only the revenue and royalty under the contract as distinguished from the contract, the trademark, the label, or the good will were assigned thereby. Plaintiff's predecessor at all times recognized the validity thereof insofar as the revenue thereunder is concerned and paid the same without question. We hold that the letter did not constitute an assignment of the label and copyright in violation of the agreement.

Affirmed.

Peterson, Justice (dissenting).
I dissent.

Magney, Justice (dissenting).
I dissent.

### After Rehearing.

On August 22, 1947, the following opinion was filed:

Thomas Gallagher, Justice.

1. In our prior opinion, filed October 11, 1946 (*supra*, p. 1), we directed attention to the case of Pelc v. Kulentis, 257 Ill. App. 213 (*supra*, pp. 10, 17), where the Illinois court upheld a contract notwithstanding one of its provisions was in unlawful restraint of trade under Illinois public policy. Many other authorities support this viewpoint. In Paramount Famous Lasky Corp. v. National Theatre Corp. (4 Cir.) 49 F. (2d) 64, 66, this rule was expressed as follows:

"It has been expressly held that, where agreements in restraint of trade were unlawful in part, they were enforceable as to the parts that were not unlawful, and this holding runs back to the earliest authorities." (Citing cases.)

The rule was expressed in Hall Mfg. Co. v. Western Steel & Iron Works (7 Cir.) 227 F. 588, 593, L. R. A. 1916C, 620, as follows:

"* * * Unless injury to the public manifestly outweighs the public policies of honesty and of freedom of alienation, restrictive covenants should be enforced. Here, of course, honesty condemns the conduct of appellee. Freedom of alienation is a byword, if appellee may sell property, retain the proceeds, and then repossess itself of the property with impunity. And what injury to the public was done that proponderates over honesty and freedom of alienation in the other scale? * * *

"But, apart from the covenants, we think appellant is not remediless. If the covenants were considered void, that would not vitiate the contract in other respects, since there is nothing immoral or criminal in making such covenants. They are merely unenforceable civilly at the worst." (Citing cases.)

In F. F. East Co. Inc. v. United Oystermen's Union, 128 N. J. Eq. 27, 35, 15 A. (2d) 129, 134, the New Jersey court held a contractual provision contrary to public policy, but stated:

"* * * But we have the further insistment by the complainant that the whole contract must fall and that it is not divisible. It seems to me that as to the other provisions of the contract, i. e., fixing specifications for the measuring cup * * * fixing rates of pay and wages and providing for the sanitary conditions * * * the provision in reference to shop steward and his duties, * * * and, in general, the other provisions of the contract * * * are and have uniformly been held to be proper subjects and objects of contracts * * * and that as to these terms and provisions, the public is not interested * * * so as to permit complainant to take advantage of the rule above invoked and permit it to escape the contract because of the superior rights of the public to have it terminated as illegal.

24

\* \* \* \* \*

"Mr. Justice Heher, in Cameron v. International, etc., Union, 119 N. J. Eq. 577 (at p. 589), 183 Atl. Rep. 157 [163], said:

" 'It is the rule, well grounded in our jurisprudence, that, where a contract contains a promise in reasonable restraint of trade and one in unreasonable restraint, the former promise is enforceable, unless the entire agreement is part of a plan to obtain a monopoly obnoxious to the law.' "

In Central New York Tel. & Tel. Co. v. Averill, 199 N. Y. 128, 138, 140, 92 N. E. 206, 209, 210, 32 L.R.A.(N.S.) 494, 139 A. S. R. 878, the court stated:

"It is on this broad ground that I think we ought to condemn the exclusive clause of this contract as against public policy and, therefore, void. \* \* \*

\* \* \* \* \*

"Having reached the conclusion that the exclusive clause of the contract in controversy is void, we are brought to the question whether its invalidity necessarily avoids the whole contract. I think that it does not. \* \* \* [citing Oregon Steam Nav. Co. v. Winsor, 87 U. S. (Wall.) 64, 22 L. ed. 315, in which the court quotes with approval] Chitty's statement \* \* \* 'that agreements in restraint of trade, whether under seal or not, are divisible; and, \* \* \* when such an agreement contains a stipulation which is capable of being construed divisibly, and one part thereof is void as being in restraint of trade, whilst the other is not, the court will give effect to the latter, and will not hold the agreement to be void altogether.' "

See, also, 36 Am. Jur., Monopolies, Combinations, etc., § 199; Nicholson v. Ellis, 110 Md. 322, 73 A. 17, 24 L.R.A.(N.S.) 942, 132 A. S. R. 445; Schibi v. Miller (Mo. App.) 268 S. W. 434; Oregon Steam Nav. Co. v. Winsor, 87 U. S. (Wall.) 64, 22 L. ed. 315; Stewart v. Lehigh Valley R. Co. 38 N. J. L. 505.

In Fox Film Corp. v. Ogden Theatre Co. Inc. 82 Utah 279, 286, 17 P. (2d) 294, 297, 90 A. L. R. 1299, the applicable law was stated as follows:

*"Provisions in restraint of trade are held by most courts to be severable from the body of the contract and no bar to enforcement of the remaining portion of the agreement, especially in cases where one party has obtained the benefits of performance by the other. There are cases in which contractual provisions that are felonious or malum in se may invalidate the whole contract, but the provision at bar is not in that category.* It is, however, a provision that is tainted with evil design and deserves no praise. But it is clearly severable, and we are of the opinion that it comes within the rules laid down by a great majority of the decisions concerning similar provisions." (Italics supplied.)

2. It is to be noted that Nicol has complied with all the provisions of the agreement on his part to be performed. He has transferred his stock to plaintiff's assignor. He has refrained from competing with plaintiff or its assignor in any similar type of business for the past 12 years. He has not disclosed the formula for the cleansing compound or made it available to others who might compete with plaintiff or its assignor. He has not used the trademark or copyrighted label. He has surrendered all claims for past-due wages. He has surrendered any rights under the original 1933 sales agreement whereunder plaintiff's assignor was to invest an additional $10,000 in the corporation. He has waived his right to compel plaintiff's assignor to transfer the Barnes shares of stock as agreed in 1933.

The contractual provision attacked by plaintiff was inserted in the contract by plaintiff's assignor for its benefit. It was drafted by its counsel. It was of no concern to Nicol whether such provision was omitted or inserted. Certainly, he was unaware that it was contrary to public policy under the Illinois law; while counsel for plaintiff's assignor, who drafted the instrument, might be deemed cognizant of such fact. Plaintiff's assignor has profited throughout by the arrangement. It has had the exclusive use of the formula, the trademark, and the copyrighted label. It has excluded Nicol from the corporate affairs and management. Its sales of the compound have increased substantially through the years. Notwithstanding this, plaintiff asserts that Nicol has no further right to his formula, to the

shares of stock transferred by him, to the Barnes stock, to the back wages due him, to the trademark and copyrighted label, or for the damages sustained by his long abstention from competitive enterprises. At the same time, plaintiff asserts that it is entitled to retain all such rights and assets as its absolute property, without obligation of any kind to make the required payments therefor; that this result is achieved solely and simply because Nicol acquiesced in the request of plaintiff's assignor that an unlawful provision in its favor be included in the contract.

3. It is suggested that this court erred in construing the restrictive covenant as a covenant not to use the "Brite-Ize" formula in competition with plaintiff's assignor. It is also urged that because said contract does not use the word "secret" in describing the formula the law applicable to secret formulas cannot be applied here. The covenant in question restricts Nicol from manufacturing or selling directly or indirectly any abrasive compound competitive to "Brite-Ize." Aside from the principal question of time and space affecting such agreement, can it be said that thereunder Nicol would have the right to manufacture and sell the "Brite-Ize" compound, made in accordance with the formula involved, without being held in violation of such covenant because no reference is made therein to this particular formula? It is obvious that any such action on his part would constitute a direct violation of this covenant. Hence, there must be implied in this paragraph a covenant not to use this particular formula, as well as any similar formula, and likewise a covenant not to engage in any competitive business. The failure to use the word "secret" in describing the formula would not change its character as such. Throughout the negotiations, and even subsequent thereto, when the original corporation was sold to plaintiff herein, the formula was to be carefully guarded and disclosed to no one. Applying ordinary logic to the covenant in question, it is clear that therein are two distinct undertakings by Nicol, namely (1) not to engage in any competitive enterprises with Barnes-Noble Company, and (2) not to use this or any similar formula as long as the contract should remain in force and effect.

4. It is suggested that, since only one consideration covered both covenants, the agreement is not divisible. But one consideration covered the covenants in each of the cases cited here. Nevertheless, the courts held such covenants divisible and enforced the valid covenant to the full extent for the consideration involved. Here, it may be said that plaintiff's assignor is not compelled to pay the whole consideration for only part performance. Nicol has fully performed both covenants. Were he to refuse to perform the invalid one and insist upon full performance on plaintiff's part, plaintiff might then have just cause for complaint. It is plaintiff who asserts the invalidity of the covenant and seeks to escape his obligations thereon, while retaining the full benefits of the agreement.

The circumstances outlined as aforesaid might reasonably be held to estop plaintiff from now asserting the invalidity of the agreement. For these reasons, as well as those previously expressed, the original opinion herein is adhered to.

MAGNEY, JUSTICE (dissenting).

In the original opinion, the material portions of the contract (dated December 10, 1935) here involved are set out. The validity of the following paragraph is challenged in this action:

"Second party, for himself, his heirs, executors, administrators and assigns agrees that he will not enter into or engage in any business of manufacturing or selling, nor in any manner be associated with, a business of manufacturing or selling any abrasive scouring powder, or competitive product to 'Brite-Ize Cleanser' so long as this agreement shall remain in full force and effect, and will not sell or assign said Copyright or Trade Mark."

In the original opinion, it was held that the contract was executed and delivered in Illinois and that under the law of Illinois an employe's covenant not to engage in a competitive business with his former employer for an unlimited time in an unlimited space is invalid as contrary to public policy. I am in full accord with that holding.

In the majority original opinion, it is stated:

"* * * Therein [referring to the contract of December 10, 1935] Nicol *covenanted not to use it,* directly or indirectly, in competition with the corporation, and the corporation agreed to pay him $250 a month in consideration therefor." (Italics supplied.)

It also states:

"It is true that under the contract Nicol covenanted not to engage in any competitive business either *in the use of the formula* or otherwise." (Italics supplied.)

I find no such provisions in the contract. Several readings of it fail to disclose a word about a secret formula. On the assumption that such a provision is found in the contract, the original majority opinion concludes that, although the covenant not to engage in a competitive business is invalid, that part of the contract which relates to the use of the secret formula is valid under the Illinois decisions, particularly Pelc v. Kulentis, 257 Ill. App. 213. The contract involved in the Pelc case contained two separate covenants, and the court held that the invalidity of one independent covenant does not prevent enforcement of other valid provisions therein. In the opinion filed on reargument, the cases cited also involve contracts containing both valid and invalid covenants. It holds that such contracts are divisible and are enforceable as to the parts that are not unlawful. In the instant case, as I see it, there is but one covenant and that an illegal one. Being only one, it is not divisible or severable. But assume there are two covenants in the contract, one legal and the other illegal, as the majority opinion declares, the agreement to pay $250 per month covers the full consideration to be paid. That item is certainly not divisible.

The facts that the contract may have been beneficial to plaintiff and that defendant has observed all the terms of the agreement have no bearing on the question of the validity of the contract and create no occasion for invoking the rule of estoppel, first raised in the final paragraph of the opinion.

If defendant disclosed or attempted to disclose the formula, claimed secret, it may be that he could be enjoined from doing so,

but as I see it he could not be so enjoined under any provision of the contract here questioned, but because of the former relationship of employer and employe.

For the above reasons, I respectfully dissent.

PETERSON, JUSTICE (dissenting).
I concur in the views of Mr. Justice Magney.

MATSON, JUSTICE (dissenting).
I concur in the dissenting opinion of Mr. Justice Magney.

